PHILLIP DIXON, JR. *v.* STATE OF INDIANA.

[No. 172A30. Filed December 26, 1972.]

*Mrs. Harriette Bailey Conn*, Public Defender of Indiana, for appellant.

*Theodore L. Sendak*, Attorney General, *Mark Peden*, Deputy Attorney General, for appellee.

## CASE SUMMARY

BUCHANAN, P.J.—This is an appeal by petitioner-appellant, Phillip Dixon, Jr. (Dixon), from the denial of his Petition for Post-Conviction Relief, pursuant to P.C. Rule One, claiming, inter alia, misconduct of the trial judge and existence of evidence of material facts not previously presented at his court trial, thereby requiring vacation of his conviction.

We affirm.

CASE HISTORY—Dixon was charged by indictment on three counts of Sodomy, Rape and Aggravated Assault and was convicted by the trial court of Sodomy on March 28, 1969. The appeal taken by Dixon stated as grounds for reversal in substance that the evidence was insufficient to convict, the conduct proved was not covered by the Sodomy Statute, the Sodomy Statute is void for vagueness on Constitutional grounds and the Sodomy Statute violates due process.

On April 8, 1971, our Supreme Court affirmed the conviction, *Dixon* v. *State* (1971), 256 Ind. 266, 268 N.E.2d 84.

In response to the Public Defender's Petition to Withdraw As Pauper Counsel for Dixon because in the Public Defender's opinion the appeal from the Post Conviction Relief Proceeding is wholly frivolous, this court on June 21, 1972, handed down a Per Curiam Opinion denying the Public Defender's Petition and directing the Public Defender to file an Amended Appellant's Brief within thirty days and granting the appellee thirty days thereafter for filing of its Brief. This was done.

This appeal from the Post Conviction Relief Proceeding (the Hearing herein) is therefore now considered on the merits.

FACTS—Relevant facts to this appeal and supporting Dixon's conviction are:

Dixon met Beverly Lewis (Beverly) for the first time on the night of June 20, 1968, in a tavern in the city of Indianapolis. She testified that at 2:00 A.M. they left the tavern and proceeded to her home for the purpose of inspecting an automobile located in her garage which Dixon indicated he might be able to repair. After gaining entrance to her home under the guise of leaving his name and telephone number, Dixon forced her to submit to sexual intercourse and cunnilingus. Beverly, a married woman whose husband was in military service, testified that Dixon was unknown to her prior to June 20, 1968, the night of the attack.

At the trial, Dixon's defense relied primarily on the alibi testimony of four witnesses—his wife, Overton Jackson, Maurice Johnson, and Samuel Lambert—to substantiate his presence at a card game at the Dixon home during the hours when the attack took place. Overton Jackson, a co-worker of Dixon at Indianapolis Chevrolet plant, testified only as to the card game at Dixon's home. He was not questioned about Beverly.

Dixon testified at the trial that he had known Beverly for approximately three months, had engaged in intercourse with her on previous occasions prior to June 20, 1968, but had not done so on the night in question.

He was represented at trial by private counsel.

Dixon's brief complained that certain questions and comments by the trial judge constituted misconduct on his part:

*Direct Examination of Beverly Lewis*

"Q. Do you know Phillip Dixon, Jr.?
A. Do I know him.

Q. Yes.

A. Not personally.

THE COURT: THAT's the right answer."
(P. 72, l. 25)

and again to Miss Lewis on pages 74 and 75:

"THE COURT: Say this again. I got to go over that a little bit. That's the most important part of this case when you slumping [sic] over it. Let's go over that slowly. Who left with you?

A. Phillip Dixon left with me.

THE COURT: You said he, and I thought that was maybe Mr. Millen. [the Deputy Prosecutor]

A. No.

THE COURT: He came over to your table?

A. Yes.

THE COURT: And he asked you to go with him and he left with you, correct?

A. He asked me if I would take him . . . he said take him to 20 . . . I think it's about 22nd and Schriver, right there at the alley, and . . .

THE COURT: And you never knew him before then?

A. No, I just seen him, you know.

THE COURT: And you took him?

A. Yes, I took him.

THE COURT: Okay, State."

and at pages 76 through 78:

"Q. About what time was it when you got at your Home?

A. Must have been around something till three, I imagine.

THE COURT: What time?

A. I imagine it was something till three.

THE COURT: Where was your husband?

A. He's Stationed in Camp LeJune, North Carolina.

THE COURT: And this was a date that you had?

A. No, it was not a date.

THE COURT: Well, I can't understand you lady. Maybe I'm hearing wrong or else you're not talking loud or talking . . .

A. No, the man, well, he was telling me . . .

THE COURT: You took him on Schriver? You wouldn't take me on Schriver.

A. Well, . . .

THE COURT: And you wouldn't let me sit at your table.

Q. Just go ahead and explain to the Judge what happened.

A. Yes.

THE COURT: I'm having trouble understanding.

A. The man told me that he worked at Chevrolet, and he does body work, and so he was asking me if I had a car, and I told him I had a '58 Chevy, which I did at the time, and he was asking me what all was wrong, and I tried to explain to the best of my knowledge, and he said well he would take a look at my car, and this is why he went home with me, supposedly.

THE COURT: At 2:00 o'clock in the morning?

A. Yes, huh-huh.

THE COURT: Okay.

A. And, . . .

THE COURT: It's kind of hard to believe, isn't it?

A. Huh?

THE COURT: Kind of hard to believe?

MR. MILLEN: Not in light of the rest of the testimony, Judge.

THE COURT: Huh? What'd you say?"

and at page 98, lines 17-18, upon direct examination of Police Officer Gerald Young:

"THE COURT: You'll never be chief. I take it back."

Finally, on page 102 there was testimony by the police photographer, who had taken photographs of various rooms in Beverly's house including the furnace room:

"THE COURT: Take a picture of the defendant . . . or the prosecuting witness?

A. I don't know whether they did or not, sir. They took her to the hospital.

THE COURT: Isn't that the charge here instead of arson?

MR. MILLEN: No arson.

THE COURT: Well, I say it, but you're trying to prove an arson case here, or something. Malicious trespass. Let's try this case."

Following his conviction, Dixon filed a pro se Petition For Post-Conviction Relief under Rule PC. 1, (the Petition herein), alleging prejudice on the part of the trial judge and the existence of newly discovered evidence from one of Dixon's trial witnesses corroborating Dixon's earlier testimony that he had known Beverly prior to the evening of the alleged crime.

The Public Defender appointed to represent Dixon amended this Petition on November 4, 1970, so that it included an Affidavit by Overton Jackson swearing that he was aware that Dixon and Beverly had been engaged in an "affair" approximately two years prior to the time of Dixon's arrest and he had observed them together frequently during that time.

The State's Answer to Dixon's Petition was one of admission and denial. On September 22, 1971, the trial court conducted a hearing and subsequently denied the Petition after testimony was heard from Beverly, Overton Jackson, and Maurice Johnson—the latter two witnesses testifying to a two-year relationship between Dixon and Beverly.

The State submitted no evidence and raised no defense or objection other than a request to overrule the Petition.

In the course of the Hearing the trial judge engaged in these exchanges with Dixon:

"Q. Mr. Dixon, just to make sure that I've covered this whole petition, which is quite long, is there anything you'd like to tell the Court, that we didn't cover on direct or cross examination, in support of your petition?

A. Well, not necessarily. . . .
* * *

Q. Now, this may be your last opportunity to testify, so, if you have anything, I'd appreciate it if you'd present it to the Court.

A. Well, there's a lot of things that's been taken place between me and Miss Beverly Lewis that never has been brought out.
* * *

Q. Now, Mr. Dixon, Phillip, I want to make sure you get a full and fair hearing here today. Now, if there is more information which you want to present, with the indulgence of the State and the patience of the Court, I'd like for you to present it right now.

A. Well, Mrs. Lewis * * *.
* * *

Q. Now, is there anything further, Mr. Dixon?

A. No, it isn't."

and with reference to Beverly's testimony in the original trial that Dixon inserted a salt shaker into her vagina:

"THE COURT: But, you did see her, and you told me all about this, didn't you, at the time of trial? About the V. D., and everything else?

A. Right, sir.

THE COURT: Sure, I remember that. Remember the salt shaker, too?

A. Quite sure. You waived [sic] it in my face."

ISSUES—The following issues are presented for review by this appeal:

ISSUE ONE.    Did the trial court err in denying Dixon's Petition because no evidence of material facts not previously presented and heard was shown to exist?

ISSUE TWO.    Did the trial court err in refusing to vacate Dixon's conviction on the basis that his first trial and the Hearing were not fair and impartial because of improper remarks of the trial judge amounting to misconduct?

ISSUE THREE. Was the trial court's denial of Dixon's Petition supported by sufficient evidence?

As to ISSUE ONE, Dixon contends, *inter alia*, that for purposes of post-conviction relief, the evidence sought to be presented does not have to be newly discovered, but needs only to be material and decisive in nature and must raise a strong presumption that it would probably change the results of the trial.

In response, the State contends the trial court properly found that Dixon waived the right to use this new evidence by his failure to present it at the original trial or present some satisfactory explanation for his failure to advance this claim in his direct appeal.

Furthermore, even if Dixon had not waived his right to present new evidence, the trial court properly denied his Petition because the new evidence is not sufficiently material to require vacation of the conviction. Also, granting Dixon's Petition would serve only to prolong litigation and turn post-conviction relief into some sort of super-appeal.

As to ISSUE TWO, Dixon contends remarks by the trial judge in both proceedings indicated prejudice and a lack of impartiality on his part thereby denying him a fair trial.

In response, the State contends that the allegedly improper remarks were directed at prosecution witnesses in a trial before the court and did not harm or prejudice Dixon.

As to ISSUE THREE, Dixon contends that since the State presented no evidence at the hearing on the Petition, his evidence was more than sufficient to establish his claim to relief.

In response, the State contends that the lack of contradictory evidence introduced by the State does not itself establish Dixon's right to relief. The State also contends Dixon waived this issue by his failure to support his argument with any citation or authority.

## DECISION

ISSUE ONE—The trial court did not err in denying Dixon's Petition for Post-Conviction Relief because no evidence of

material facts not previously presented and heard was shown to exist.

In order to succeed here Dixon must bring himself within the applicable provisions of Post-Conviction Remedy Rule 1:

"SECTION 1. Remedy—To whom available—Conditions.

(a) Any person who has been convicted of, or sentenced for, a crime by a court of this state, and who claims:
\* \* \*

(4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice;
\* \* \*

(b) This remedy is not a substitute for a direct appeal from the conviction and all available steps including those under Post-Conviction Remedy Rule 2 should be taken to perfect such an appeal.
\* \* \*

In order to secure a new trial or vacation of his sentence Dixon is required by Rule PC. 1, § 1(a)(4), to prove by a preponderance of the evidence that there exists evidence of material facts which have not been "previously presented and heard."

If evidence of material facts has been previously presented and heard, then that issue may be waived. *Langley* v. *State* (1971), 256 Ind. 199, 267 N.E.2d 538. If a defendant has "waived" an issue in the sense that he has knowingly and voluntarily relinquished a right, the State must raise this question at the Post-Conviction hearing. *Langley* v. *State, supra;* ABA Standards Relating to Post-Conviction Remedies, Approved Draft, 1968, Part VI, 6.1—Finality of Judgments, P. 85-90.

The Record and Transcript before us indicate that the State did not interpose a defense of waiver by way of Answer to Dixon's Petition, nor did it do so at the Hearing. Waiver as a defense to Dixon's Petition did not appear until this appeal was perfected.

The material facts relating to the availability of the impeaching testimony of Jackson and Johnson was not a claimed error or issue as such in the previous appeal.

Justice Hunter made this point in Footnote 2 of *Langley* v. *State, supra:*

"* * * However, it would seem that the state is precluded from asserting waiver on appeal where they made no mention concerning it at the hearing on the same basis that an appellant is normally denied the right to raise an issue for the first time on appeal."

Waiver on Dixon's part, within the limited meaning of that term as used in the ABA Standards Relating to Post-Conviction Remedies, *supra,* might be inferred because failure to present the impeaching testimony of Jackson (and Johnson) was by its very nature within the knowledge of Dixon and he knowingly and voluntarily relinquished the right to present it in favor of alibi evidence. *Langley* put it this way:

"Furthermore, such a requirement [objection at trial] bars a litigant from asserting error on appeal, objection to which he chose to forego for strategic reasons at trial. Thus, where a defendant is effectively represented by trial counsel and objections to trial procedure, admission of evidence, etc. are foregone, a binding waiver of the right to object may be asserted against the defendant." [Citing cases.]

It is probably more accurate, however, to describe Dixon's failure to introduce this impeaching testimony in terms of finality of judgment rather than in terms of waiver. See, ABA Standards Relating to Post-Conviction Remedies Approved Draft, 1968, § 6.1, page 88. But the State having failed to raise the question of waiver or finality of judgment, we proceed to determine whether the trial judge should have allowed post-conviction relief because of the omitted testimony of Jackson and Johnson.

At the Hearing evidence was presented by Jackson and Johnson to the effect that Dixon had known Beverly for a

period of three years and had engaged in an "affair" with her. These same two witnesses along with two others (Lambert and Dixon's wife), previously testified only in support of the alibi defense of Dixon, i.e., that Dixon played cards at his home during times and dates when Beverly was sexually assaulted, and not as to the duration of the purported relationship between Dixon and Beverly.

Beverly testified at the trial that she never met Dixon until the ill-fated night of June 20, 1968. Dixon's testimony was that he had known Beverly for a period of three months prior to June 20, 1968.

By introducing testimony at the hearing by two of the alibi witnesses that there was a long-standing relationship between Dixon and Beverly the obvious intent was to impeach Beverly's trial testimony that she had not previously known Dixon.

Is further impeachment of the testimony of the prosecuting witness (Beverly) evidence of material facts not previously presented and heard, that would require vacation of the conviction or a new trial?

The cases indicate negative.

Since Post-Conviction Remedy Rules 1 and 2 became effective on August 1, 1969, our Supreme Court has on several occasions treated what constitutes the existence of evidence of material facts which would justify vacation of the conviction or a new trial. *Robbins* v. *State* (1971), 257 Ind. 273, 274 N.E.2d 255; *Asher* v. *State* (1971), 256 Ind. 381, 269 N.E.2d 156; *Wilhoite* v. *State* (1971), 255 Ind. 599, 266 N.E.2d 23, 25; *Ayad* v. *State* (1970), 255 Ind. 156, 263 N.E.2d 150; *Langley* v. *State, supra.*

From these cases certain rules or guidelines emerge by which a court may determine what constitutes the existence of evidence of material facts not previously presented and heard.

One such guideline is that:

"To justify a new trial, the newly discovered evidence . . . *must* be material and decisive in nature and must be such as to *raise a strong presumption that it would probably change the results* of the trial." *Wilhoite* v. *State, supra.* [Citations omitted.] (Emphasis supplied.)

*Wilhoite* was cited and followed in *Asher* v. *State, supra,* wherein Chief Justice Arterburn who wrote both opinions, concluded that the new evidence presented must be such as would present a "strong likelihood . . . that a new trial would reach a contrary result."

By this standard there is no "likelihood" or a strong presumption that the further impeachment of the prosecuting witness Beverly would change the results of the trial. Such testimony would only be cumulative and could not change the results of the trial. *Asher* v. *State, supra.*

This case is unlike *Ayad* v. *State, supra,* or *Brady* v. *State of Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215, both of which exhibited circumstances of coercion or lack of personal knowledge of which defendant was not aware at the time of the trial and the appeal therefrom.

Competency of counsel is not challenged by Dixon, nor is any other explanation given as to why this cumulative impeaching testimony was not presented at trial.

Under these circumstances, the trial judge properly determined that the discovery of the cumulative impeaching testimony of the witnesses Jackson and Johnson was not evidence of material facts not previously presented and heard. *Wilhoite* v. *State, supra; Asher* v. *State, supra; Langley* v. *State, supra.*

ISSUE TWO—The trial court did not err in refusing to vacate Dixon's conviction on the ground that he was denied a fair and impartial trial and Hearing because of misconduct of the trial judge.

*Langley* v. *State, supra,* again compels us to consider this issue on its merits. Misconduct of the trial judge was not one of the issues raised in the appeal of Dixon's conviction, al-

though it could have been raised. The State was silent at the Hearing as to this question. So, whether Dixon's failure to include the alleged misconduct in his Motion to Correct Errors technically constitutes "waiver" or is prohibited by "finality of judgment" is of no moment for our present purpose. The distinction is important for some purposes.[1]

So we proceed to a discussion of the merits of this issue.

Beginning in 1970 three appeals have been decided by our Supreme Court involving misconduct of the trial judge in each of which his commentary during the non-jury trial was the basis for seeking reversal on appeal. These three cases are: *Dean* v. *State* (1970), 254 Ind. 190, 258 N.E.2d 636; *Owens* v. *State* (1971), 255 Ind. 693, 266 N.E.2d 612; and *Gray* v. *State* (1971), 256 Ind. 342, 268 N.E.2d 745.

In each of them the trial judge was the same trial judge as in the case before us. All three were affirmed.

In *Dean, supra,* none of the trial court's intermittent comments were set forth in the opinion other than a certain philosophical discussion of the beneficial influence of social and spiritual ties between a youth and home life. The court observed that this philosophic discussion could not have prejudiced the defendant.

The defendant's contention in *Owens* v. *State, supra,* was

---

1. The ABA Standards Relating to Post-Conviction Remedies Approved Draft, 1968, § 6.1, page 88, emphasize the distinction:

"A most difficult concept to control in any context is that of waiver; this is no less true in post-conviction remedies. The term is subject to multiple meanings . . . One usage employs waiver as expressive of a rule of finality of judgments: issues that were not presented at a specified time or in a specified way are said to have been waived . . . A wholly different waiver is implied in the familiar principle that a party to a criminal action can intelligently and understandingly forego certain rights, and that his choice will be binding upon him."

"As used in this report, 'waiver' refers to voluntary relinquishment rather than foreclosure by judgment."

Another quote at page 86 is germane:

"In the main, post-conviction remedies exist to try fundamental issues that have not been tried before."

However, if it appears a defendant has deliberately failed "to present an issue with an intention to present it later" this may constitute abuse of process. (P. 88.)

that she received a hearing punctuated with quips and running commentary, judicial intrusions, and premature resolution of the most vital issue of fact, all of which were "demeaning to the court, the judiciary, and the bar." The trial judge assisted the prosecutor in getting the value of a sweater into evidence and directed certain comments and criticism and sarcasm to the prosecutor in charge of the case. In response to this charge of judicial misconduct, the Per Curiam opinion expressed its distress by stating:

> "We do not commend such running commentaries by a judge who is clothed with the robe and behind the bench, with all the prerogatives adhering to such an office, * * *. Tolerance and understanding are much more worthy judicial attitudes under the circumstances.
>
> "* * * we would question the propriety to some of the statements."

The opinion in *Gray* v. *State, supra,* does not quote from the record the excerpts of the trial judge's comments "that were extremely critical of both the prosecution and the defense counsel." Because the defendant failed to demonstrate how these remarks prejudiced his case, the court found no basis for reversal, stating:

> "The mere fact that the trial judge was discourteous to counsel and unduly critical of their conduct of the case does not in and of itself render the proceeding void when the cause is being tried without the intervention of a jury. United States v. Kaufman (7th Cir. 1968), 393 F. 2d 172."

Dixon's trial in the case before us falls in the pattern of these three cases. The trial judge's alleged misconduct at the trial was directed at prosecution witnesses only and may fairly be described as consisting of quips, sarcasm, and ridicule. This commentary indicated no personal bias or prejudice toward the defendant Dixon.

At Dixon's Hearing on the Petition, the court afforded Dixon every opportunity to further state any information or evidence relative to the post-conviction proceedings. The

court's gratuitous reference to the salt shaker, while inappropriate and undignified, could not be characterized as a positive indication of personal bias to the defendant Dixon.

For many years[2] the Canons of Judicial Ethics have provided that a judge's official conduct should be free from impropriety or the appearance of impropriety and that he should be courteous and civil and should so conduct official proceedings as to reflect the importance and seriousness of the inquiry into truth. (Canons 4, 10, 34, and 36.)

About the time the original appeal in *Dixon* v. *State* was decided by our Supreme Court, it adopted a Code of Judicial Conduct and Ethics for the Indiana Judiciary which incorporated many of the essential features of the Canons of Judicial Ethics. Included in this Code is the mandate that a judge's official conduct should be free from impropriety and that he should be courteous and civil to participants in the trial, and that he should not intervene in the trial in such a way as to prevent the proper presentation of the evidence or the ascertainment of truth; and further that he should not seek to be extreme or peculiar in his judgments or spectacular or sensational in the conduct of the trial because "justice should not be molded by the individual idiosyncracies of those who administer it." (Rules 1, 3, 4, 8, and 10 of the Code of Judicial Conduct and Ethics adopted by the Indiana Supreme Court on March 8, 1971.)

To the same effect are the American Bar Association's Standards for Criminal Justice Relating to the Function of the Trial Judge, Approved Draft, 1972. In describing the basic duties of the trial judge, these Standards require that the trial judge be courteous and fair and that he should reflect the dignity of his office and enhance public confidence in the administration of justice by his personal appearance and demeanor. In discussing maintenance of decorum in the courtroom, § 6.4 of the standards, titled "Judge's responsibility for self-restraint," says:

2. Originally adopted by the American Bar Association July 9, 1924.

"The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances. He should suppress his personal predilections, and control his temper and emotions. He should not permit any person in the courtroom to embroil him in conflict, and he should otherwise avoid conduct on his part which tends to demean the proceedings or to undermine his authority in the courtroom. When it becomes necessary during the trial for him to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, he should do so in a firm, dignified and restrained manner, avoiding repartee, limiting his comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues."

In *Owens* the court recognized the impropriety of similar commentary by this same trial judge and went on to say that the basic issue is whether defendant received a "fair and impartial trial." Because the evidence was conclusive of the defendant's guilt, the conviction was affirmed. On the basis of the record before us in this case, the conduct of this same trial judge consisting of running commentary, quips, sarcasm, judicial intrusions, and ridicule is different only in degree from his conduct in *Owens*. Like *Owens*, there is strong evidence of guilt and the judge was acting without a jury, permitting him discretion in the conduct of the trial.

The bias and prejudice indicated by this commentary was directed at prosecution witnesses and is therefore within the rule of the *Owens* and *Gray* cases, *supra*. While the misconduct of the judge was error, it was not reversible error, inasmuch as there is no showing by Dixon as to how or exactly in what manner he was prejudiced.

This is *not* to hold, however, that a defendant may not be deprived of a fair and impartial non-jury trial if the effect of the trial judge's intrusion of self into the proceedings creates an atmosphere which actually prevents the orderly presentation of the cause or the ascertainment of truth. Article 1, § 12 of the Indiana Constitution provides that:

"Justice shall be administered freely, * * * completely and without denial."

The rationale of *Dean, Owens,* and *Gray, supra,* is that a trial judge must necessarily have considerable latitude in the conduct of the proceedings in order to maintain discipline and control of the trial. The other side of the coin is, however, that reversible error may be committed if the trial judge abuses his discretion by intrusion of self into the proceedings in such a manner that presentation of the defendant's case is jeopardized. It becomes a due process question—a matter of providing a defendant with a complete and unobstructed opportunity to be heard.

Sarcasm and ridicule emanating from the bench in a criminal trial are destructive weaponry. They contaminate the trial. Their use by the trial judge may have an incalculable adverse effect on the administration of justice, which is all the more devastating because the negative is often more difficult to prove than the positive. Whether directed at the prosecution or the defense or both, intimidated participants in the trial may be unable to perform their proper function—a cowed defense counsel fails to object to inadmissible evidence—a rattled witness becomes incoherent. One such occurrence may thwart justice. If such adverse effects can be demonstrated, the error created will be reversible for denial of due process of law. *State* v. *Lawrence* (1954), 162 Ohio St. 412, 123 N.E.2d 271.

The trial judge in *State* v. *Lawrence, supra,* a criminal trial without a jury, so dominated the proceedings by interrupting the defense's case with threats and intimidation of defense witnesses that the conviction was reversed. The opinion observed that:

"* * * the atmosphere of the trial was such as to fall far short of the plain requirements of the law."

This is tantamount to saying that the whole proceeding may be tainted by the misconduct of the trial judge.

The atmosphere of the courtroom created by the trial judge's intrusion of self may then be such as to effectively deny a defendant due process of law. That atmosphere may be created not only by the commentary from the bench, but by the judge's demeanor—his facial expression and gestures may be as demoralizing to the participants as what he says.

This is why the Standards referred to above speak of his responsibility for self-restraint by requiring that:

"The trial judge should be the exemplar of dignity and impartiality. He should exercise restraint over his conduct and utterances."

*Wharton's Criminal Law and Procedure* (Anderson's 1957 ed.), Vol. 5, p. 170, expresses the need for self-restraint in this manner:

"In the interest of fairness, the trial judge should refrain from examining witnesses unless it becomes necessary for clear understanding of an issue involved. In doing so, he should refrain from disclosing his opinion on the merits or indicating doubt as to credibility of witnesses."

It is readily conceivable that an exhibition of bias and prejudice by the trial judge, even against prosecution witnesses only, may so distort and taint the proceedings that it can be specifically demonstrated that full and uninhibited presentation of the cause has been frustrated. In such circumstances reversible error may have been committed because the trial judge has crossed over the outer limits of discretion.

As previously indicated, the commentary by this trial judge, which is being considered on appeal for the fourth time in three years, did not amount to reversible error because there is no specific showing by Dixon that he was in fact so preju-

diced by the judge's conduct as to prevent a full presentation of his case in a due process sense. While he received a fair trial in that sufficient evidence was presented to find him guilty beyond a reasonable doubt, Dixon may nevertheless speculate as to whether he received an "impartial" trial.

This feeling was described by the court in *Ehrlich* v. *Perper* (D.C. Cir. 1963), 189 A. 2d 122, 123, a civil case for child custody:

> "When a trial judge indulges in injudicious behavior and intemperate language, it is only natural that a losing litigant leaves the court with a deep-rooted feeling that he or she has been denied a fair and impartial hearing. A trial judge can and should, by a judicious manner coupled with the use of temperate language, avoid lending substance to such a feeling."

ISSUE THREE—The trial court did not err in denying Dixon's Petition For Post-Conviction Relief even though the State introduced no evidence to contradict defendant-appellant's affidavits and testimony from corroborating witnesses. Appellant's contention that such uncontradicted testimony alone constitutes a preponderance of evidence has no merit or support in Indiana law.

The common law writ of error coram nobis and former Supreme Court Rule 2-40A establishing review by certiorari of belated motions for new trial have been interpreted as shifting the burden of proof to the defendant to establish facts requiring a vacation of a judgment. *Kuhn* v. *State* (1943), 222 Ind. 179, 52 N.E.2d 491; *Hathaway* v. *State* (1968), 251 Ind. 374, 241 N.E.2d 240.

As successor to these two remedies, the post-conviction remedy also provides that "petitioner has the burden of establishing his grounds for relief by a preponderance of the evidence." (Rule PC. 1, § 5.) Defendant Dixon, therefore, had the sole burden of presenting evidence, which is then judged by the trier of fact. We find

no error in the manner in which the trial court determined the sufficiency of the evidence in this case.

The judgment denying post-conviction relief is therefore affirmed.

Sullivan and White, J.J., concur.

NOTE.—Reported at 290 N.E.2d 731.