Randall L. WARE, Appellant,

v.

STATE of Indiana, Appellee.

No. 49A04–8904–CR–00150.

Court of Appeals of Indiana, Fourth District.

Oct. 9, 1990.

Nancy L. Broyles, McClure, McClure & Kammen, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge.

On March 30, 1988, Defendant-appellant Randall L. Ware was charged by information with operating a motor vehicle while his privileges were forfeited for life in violation of Ind.Code 9–12–3–2, a Class C felo-

ny. After a bench trial, the court found Ware guilty as charged. He was sentenced to two years imprisonment. Ware appeals his conviction and sentence, claiming that comments and actions by the judge, including his alleged assumption of an improper prosecutorial stance, denied him a trial before a fair and impartial tribunal. After an examination of the evidence and circumstances under which the trial judge acted, we find that Ware was not denied a fair trial and affirm.

## FACTS

In the early morning hours of March 29, 1988, Officer Mark Christoff of the Indianapolis Police Department observed an automobile pull into the parking lot of a motor lodge in Indianapolis. Christoff testified he observed the vehicle from approximately one block away and when the vehicle pulled into the motor lodge—an area of high drug activity—he became suspicious. Christoff testified he waited approximately two and one half minutes to see if the car was "just turning around" (R. 161). When the car did not exit the lot, Christoff followed the vehicle. As he entered the lot, he noticed the parked vehicle's trunk lock had been "punched out". Christoff testified he saw Ware exit the driver's side of the car and attempt to leave the area. After observing the car's broken steering column (a fact which, together with the punched out lock, indicated the car might be stolen) Christoff ordered Ware to return to the car. Ware could not produce a driver's license or registration. The officer testified he ran a computer check and the report came back indicating Ware had a lifetime suspension of his driving privileges due to a habitual offender status. Ware was then arrested. The officer testified there were two other female passengers in the car at the time of Ware's arrest, however, neither passenger was arrested.

At trial, Ware's defense was that he did not drive the vehicle. Ware claimed that on the night he was arrested he and three friends were out looking for a car that Ware had been hired to repossess. Ware claimed his friend, Donnie, was driving. Ware's wife, Sandra, and Mary Miller, a passenger in the car, testified at trial and corroborated this defense. Sandra testified Ware and Donnie left their home at approximately 9:30 p.m. to look for a car Ware had been hired to repossess. Sandra testified Donnie was driving the Wares' 1972 Chevrolet Impala and Ware was in the passenger seat. Mary Miller, a passenger in the car when Ware was arrested, testified that Donnie was driving, Ware was in the passenger seat and she and another woman named Tammy, Donnie's sister, were in the backseat of the car. Mary testified when they stopped at the motor lodge, Donnie exited and went into the lodge and Ware climbed out of the car when a police officer arrived on the scene. Officer Christoff testified both women passengers told him Donnie had been driving the vehicle. Officer Christoff also testified he did not see Ware drive the vehicle. Ware, Donnie and Tammy did not testify at trial.

## DECISION

On appeal, Ware claims he was denied a fair trial because the trial judge was biased against him. We note Ware did not raise this issue in his motion to correct error. Generally, the failure to include allegations of bias and prejudice on the part of the trial judge in the motion to correct error results in a waiver of the right to have this issue considered on appeal. *Thompson v. State* (1985), Ind.App., 482 N.E.2d 1372.[1] However, Ware claims the issue is reviewable under the fundamental error doctrine, citing *Kennedy v. State* (1972), 258 Ind. 211, 280 N.E.2d 611; *Decker v. State* (1987), Ind.App., 515 N.E.2d 1129.

In *Kennedy*, our supreme court refused to apply the waiver doctrine to unobjected incidents of improper judicial intervention because "[a] fair trial by an impartial judge and jury is an essential element in due

---

1. Here, the judgment of conviction was entered on December 2, 1988. Thus, the amendment to Ind. Trial Rule 59—effective January 1, 1989— which provides "A Motion to Correct Error is not a prerequisite for appeal, ..." is not applicable here.

process." *Id.* 258 Ind. at 218, 280 N.E.2d at 615. Similarly, in *Decker*, this court reviewed a defendant's claim of improper judicial intervention even though the defendant failed to make a specific objection at trial. Relying on *Kennedy*, the *Decker* court noted the fundamental error doctrine of review applies to claims of improper judicial intervention in a criminal trial. The court stated:

> " 'Fundamental error is error that, if not rectified, would deny a defendant fundamental due process. *Johnson v. State* (1979), [271] Ind. [145], 390 N.E.2d 1005. It is not enough, in order to invoke this doctrine, to urge that a constitutional right is implicated. Only when the record reveals clearly blatant violations of basic and elementary principles, and the harm or potential for harm could not be denied, will this Court review an issue not properly raised and preserved. *Nelson v. State* (1980), [274] Ind. [218], 409 N.E.2d 637.' "

*Id.* at 1132, quoting *Williams v. State* (1984), Ind., 464 N.E.2d 893, 894. Although *Kennedy* and *Decker* involved jury trials and the case before us is a bench trial, we believe the same principles apply. Here, Ware contends the judge's bias against him, as demonstrated by the judge's comments and numerous judicial interruptions during trial, denied him a fair trial. If the trial judge was biased against Ware, it is fundamental error since a fair trial by an impartial judge is an essential element in due process. *Kennedy, supra.* Thus, we will review Ware's claim.

█ We begin our discussion by noting that in a bench trial, the judge may, in his discretion, ask questions of a witness to aid in the fact finding process as long as it is done in an impartial manner and the defendant is not prejudiced. *Taylor v. State* (1988), Ind., 530 N.E.2d 1185. The judge may not assume an adversarial role in criminal proceedings. *Fox v. State* (1986), Ind., 497 N.E.2d 221. Further, a judge's discretion to question witnesses is greater in bench trials than in trials before juries. *Michigan v. Meatte*, (1980), 98 Mich.App. 74, 296 N.W.2d 190.

When Ware's trial began, the State indicated it was not ready to proceed because a crucial witness was unavailable. Ware expressed his concern that his witnesses might not be available for trial at a later date and the trial court stated that, if the parties wished, he would conduct the trial in a "bifurcated way" and would allow Ware to present his witnesses prior to the presentation of the State's case. (R. 80) The judge asked the State to make an opening statement; however, Ware was not given the same opportunity. Ware's first witness was Bob Wilson, the owner of Lucky Auto Sales. Wilson testified that he employed Ware to repossess cars and that in March of 1988 he hired Ware to repossess a 1981 white Dodge Omni, which was apparently located in the area where Ware was arrested. Ms. Julian, the prosecutor, objected to this line of questioning as irrelevant and the following colloquy occurred between the court and Ware's counsel:

THE COURT: How is it relevant, Mr. Darden?

MR. DARDEN: It's relevant from the standpoint, Your Honor, that he testified that my client was in his employment for ... in the business of repossessing cars in, uh, March of 1980. [sic] He further testified that my client had been given a 'repo' on a 1980, '81 Dodge Omni that night.

THE COURT: So what's that got to do with this case?

MR. DARDEN: Because, Your Honor, testimony will show that that's what my client was in the process of doing at the time he was arrested.

THE COURT: You just told me he was driving the car that was registered to his daughter.

MR. DARDEN: I didn't tell you he was driving the car, Your Honor. I said my client was in the process of repossessing cars. My client was not driving any car.

THE COURT: Wait a minute. I asked you ...

MR. DARDEN: But, I'm saying that he was performing his job.

THE COURT: I asked you who the car was registered to a moment ago, and you said it was registered to his daughter.

MR. DARDEN: The car that he was arrested, uh, and accused of driving belongs to his daughter.

THE COURT: He was repossessing his daughter's car?

MR. DARDEN: No, no, no, Your Honor. He was ... I'm trying to establish to the Court, lay a foundation, as to why Mr. Ware was in the vicinity of where he was arrested at, because the person who owned the car lived in that vicinity.

THE COURT: But, Mr. Darden, ...

MR. DARDEN: Yes, sir?

THE COURT: ... *if your client had no license, it seems to me, admitting that he was in the repossession business is in fact admitting that he has been violating the law.*

MR. DARDEN: No, Your Honor.

THE COURT: You can't ... can you repossess cars without ... without driving them in some way?

MR. DARDEN: Sure, Your Honor. You have an assistant; and I think the evidence will show that he used an assistant.

THE COURT: He has an assistant?

MR. DARDEN: Yes ... to help him repossess the cars.

THE COURT: *I'm going to listen at this, Mrs. Julian, because it sounds fascinating.*

MR. DARDEN: I can only give you the facts, Your Honor.

THE COURT: *Okay, it's like ... you know, it's like saying a hangman had an assistant. Go right ahead, Mr. Darden.*

MR. DARDEN: Right. Now, the ...

THE COURT: *I want to see how creative this is.*

(R. 103–107). (emphasis added). After this exchange the court then questioned Ware's employer as follows:

THE COURT: Did you know he had an assistant?

A. Yes.

THE COURT: Okay. That's not unusual in the repossession business?

A. No. They normally have two of them, normally, goes out and looks for the car. I have used different 'repo' men since I've been in business.

THE COURT: Did you know that he didn't have a driver's license?

A. No. ˙No, I didn't.

(R. 108). The State proceeded to cross-examine the witness concerning Ware's use of assistants. However, after the State's cross-examination, the court again questioned this witness:

[THE COURT]

Q. Sir, have you ever seen him drive off your lot?

A. Beg your pardon?

Q. Have you ever seen him drive off your lot in a car?

A. Yes.

Q. Okay. How many times?

A. I don't ... I never counted them. I can't, uh ...

Q. Okay. How long has he been working for you?

A. Probably over a year.

Q. And, usually, when he leaves, he's usually driving and the other party is in there with him, right?

A. Um hum. See, uh, my manager would make out the 'repos' and everything, and I would go in, and we would consult on these re ... 'repos', and I didn't see Randy as often as my manager did.

Q. Okay; but you had no idea he didn't have license or he had ...

A. No.

Q. ... somebody riding, driving for him, while he was riding shotgun? This is all news to you?

A. Right.

Q. Okay.

MR. DARDEN: Say that again, Your Honor?

THE COURT: You want to jump on that, Mr. Darden?

MR. DARDEN: Yes, I'd like to. Say that again? I'm ... I think I missed the Judge's question there. You asked

something about this was news to him?

THE COURT: Yeah. I said it was news to him that he had somebody else to drive because he didn't have any license, and he said yeah, because he says he was under the impression that Mr. Ware was doing the repossession and the other persons were helping him.

MR. DARDEN: Okay, but ... fine, Your Honor. Now, I'd like to ask a question.

THE COURT: Go right ahead.

QUESTIONS BY MR. DARDEN:

A. Now, Mr. Wilson, when you gave a person ...

THE COURT: *I can't wait.*

(R. 112–114). (emphasis added). Ware was then permitted to continue examining Wilson.

Ronald Hargraves, the manager of Lucky's Auto Sales, also testified to Ware's use of assistants. He testified that normally, two people will go together to repossess cars, but that he had seen three or four people with Ware. He also testified that he had seen Ware drive a car. After the State's cross-examination of Hargraves, the court asked him the following:

Q. Tell me something ... when you've got 4 people repossessing a car ... explain this to us ... what do they all do?

A. Well, probably just companionship, ...

Q. No, no, but ...

A. ... but sometimes ...

Q. ... you mean hugging them or ... what do you mean companionship?

A. Well, keeping him company, I imagine, but sometimes ...

Q. But I want you to explain this to me, because I'm trying to understand this.

A. Uh huh.

    *   *   *   *   *   *

Q. Okay. Give me ... when they say by the numbers, tell me, by the numbers, what everybody does?

A. Well, sometimes the more people you've got with you ... lots of times people might hide their cars a block or two away ... and people are familiar with repo-men. If they know they are behind, they are kind of watching their car. He might drop a block before, one person ...

Q. At 6 o'clock in the morning?

A. Yeah.

Q. Okay.

A. ... and they'd go by foot, ...

Q. Okay.

A. ... which, really, you've got so many cars alike, the best way to find out if it's the right car is by the VIN number on the dashboard. So he might have different people walking different blocks, looking for cars, because if you keep driving up and down the street, more than likely people are wise to you, they're going to jump in their car and take off, and you'd never find the car.

Q. I see. Very interesting.

(R. 123–125).

Ware claims the judge's sarcastic comments such as "I'm going to listen at this, Mrs. Julian, because it sounds fascinating", "I want to see how creative this is" and "I can't wait" demonstrate the judge made a premature resolution of the credibility of Ware's defense and of his guilt before the evidence was complete. Ware also argues when the judge questioned his witnesses he abandoned his "neutrality role" and actually cross-examined the witnesses in an argumentative tenor, thereby denying Ware a fair trial.

We do not agree. First of all, it is obvious from the exchange between the court and Mr. Darden that the judge was attempting to determine how Ware's repossession activities were relevant to the question of his guilt. The court ultimately permitted Ware to continue questioning Wilson. Secondly, it is evident from the above quoted exchange between the court and Mr. Darden that the court was confused as to how two people—Ware and one other person—could repossess a car without both

of them having to drive at some point. This defense, as presented by Ware, seems to invite confusion and to require clarification. Thus, the judge's confusion, and perhaps skepticism—as evidenced through his comments and questions—can more readily be classified as natural reactions to Ware's defense and not an indication that he determined Ware's guilt before the State presented its case. A judge's ordinary and natural reaction to the conduct of, or evidence developed in, a case before it does not show bias on the part of the judge. *See*, 46 Am.Jur.2d *Judges* § 170 (1969).

■ Ware also claims that by bringing out facts not already in evidence, the court's questions to Wilson and Hargrave prejudiced him. We have already recognized that a judge may only ask questions of a witness if it is done in a impartial manner and the defendant is not prejudiced. *Taylor, supra*. However, we find that the new facts elicited by the court's questions did not prejudice Ware.

We note initially that the court did not elicit any new facts from Hargraves. He had already been asked about Ware's use of assistants and whether he had seen Ware drive before the judge questioned him. Thus, the judge's questions of Hargraves is an attempt to clarify facts to which he already testified.

The judge did, however, elicit facts not already in evidence from Wilson. The most harmful of these was that Wilson had seen Ware drive a car and that Wilson was not aware Ware did not have a license. These facts, when viewed in light of the real issue in this case—not whether Ware had driven an automobile on other occasions in the course of his repossession activity, but whether he was driving the car on the night he was arrested—are only tangentially related to the question of Ware's guilt. Ware would have only been prejudiced if the judge had determined that, because Ware had driven without his driver's license on other occasions, he was driving on the night in question. There is nothing in the record which indicates to us that the judge made this determination. Therefore, we find that even though the court was not merely seeking clarification of facts already known to it in its questioning of Wilson, Ware was not prejudiced by the court's questions.

■ Ware also claims the judge assumed an improper prosecutorial stance by questioning his rebuttal witness, Mary Miller.[2] Miller testified that she told the police officer that someone else had driven Ware's car onto the lot of the hotel. She stated that he went into the hotel and did not come out until Ware was in the police car. Finally, she testified that although she pointed this other person out to the officer, he told her he did not see anyone. The judge then questioned Miller as follows:

---

2. In addition, Ware claims the judge improperly questioned his counsel on why he was recalling Miller and what he intended to rebut. The following exchange occurred between Mr. Darden and the court when he requested permission to recall Miller as a witness.

MR. DARDEN: Judge, we have one, I guess you would title it, rebuttal witness that I would like to call at this time.
THE COURT: Please do, Mr. Darden.
MR. DARDEN: Your Honor, we would like to call Mary Miller.
THE COURT: Okay. Mary who?
MR. DARDEN: Miller. Mary Miller.
       \*   \*   \*   \*   \*   \*
THE COURT: Didn't she testify last time?
MR. DARDEN: Rebuttal, Your Honor. This is more or less a rebuttal witness.
THE COURT: Rebuttal to what?
MR. DARDEN: Something that the officer testified to, Your Honor. At the time, we had not heard, you know, his testimony, so we didn't know what he was going to be saying. So it would be ...
THE COURT: You didn't have any idea?
MR. DARDEN: Well, Your Honor, ...
THE COURT: What did he say that surprised you?
MR. DARDEN: Uh, surprised me, Your Honor, that he said that they told him that there was another person that had driven the car there. Her testimony will be, more or less, concerning whether or not they pointed the person out to him. Ms. Miller, would you come and take the witness stand?
(R. 201–203). The judge then permitted Miller to testify. These questions merely reflect the judge's curiosity as to why Ware called Miller back to the stand and do not reflect any bias on the part of the judge.

Q. Did that person walk up to the car, that just came out of the room, had driven the car up there?

A. No, he just walked on past.

Q. Why do you think he did that? Why wouldn't he come up and ...

A. I have no idea why.

Q. ... and say, "I was driving the car"?

A. Pardon me?

Q. Why wouldn't he come up and say, "What's going on here? You've got my friends arrested"?

A. Probably because he was already in the car. He just walked on by.

Q. Walked on by, sounds like a song.

(R. 206–207). Ware's counsel continued his examination of Miller and the witness was excused without cross-examination from the State.

In *Fox, supra,* our supreme court stated: The trial judge may not assume an adversarial role in the proceedings but may intervene in the fact-finding process and question witnesses in order to promote clarity or dispel obscurity. The purpose of the judge's discretionary power to question witnesses is to allow the court to develop the truth or present facts which may have been overlooked by the parties. The judge has not abused this discretion when the intervention is conducted in an impartial manner and the defendant is not prejudiced.

497 N.E.2d at 227.

We find that the judge's questioning of Miller does not rise to a level of aggression which shows the judge took a prosecutorial or adversarial role in the proceedings. Miller testified that another man had been driving the car. However, defense counsel had not established who this man was and it was unclear why the alleged driver did not stop when he saw Ware had been arrested. Thus, the judge, by asking these questions of Miller, was trying to clarify facts to which Miller had already testified. Further, the questions did not prejudice Ware because Miller was merely repeating her earlier testimony.

Ware claims that the court's interruptions during his final argument, coupled with the interruptions during the trial (discussed above) demonstrate the judge had determined Ware's guilt before all the testimony was presented. It is true that during Ware's final argument, the court engaged in an exchange with defense counsel. Admittedly, there was a great deal of informality during his closing statements. However, Ware, in his brief, does not point to any specific language which would indicate that the judge had predetermined Ware's guilt.

We first observe that any exchange during Ware's closing argument necessarily occurred *after* all the evidence was presented. Thus, the exchange would not indicate the judge had prejudged Ware's case before all the evidence was heard. Secondly, we have examined the exchange and have found nothing to indicate to us that the court prejudged this case.

We also find that court's interruptions during trial do not demonstrate a prejudgment of the case. In *People v. Johnson* (1972), 4 Ill.App.3d 539, 281 N.E.2d 451, the defendant claimed the trial court determined his guilt before the end of the case. A fact crucial to the defense was whether the defendant had fired shots at a policeman. Although Johnson claimed no shots were fired, a police officer testified that Johnson had fired a shot. During the testimony of a defense witness, the judge asked "Was that before or after the shotgun was fired?" Near the end of this witness's testimony, the state objected to one of defense counsel's questions, to which the court responded: "There will be a finding of guilty." *Id.* 281 N.E.2d at 452. Johnson was then permitted to continue his defense. The court on appeal found that the court's statement that there would be a finding of guilty, in addition to the question asked of the defense witness, clearly demonstrated that the court had determined shots were in fact fired before all of the evidence was presented. Because this fact was crucial to Johnson's defense, the court

held that Johnson was denied a trial before a fair and impartial tribunal.

We agree with the *Johnson* court that a defendant is denied a fair trial if the judge, before hearing all the evidence, makes it clear he will find the defendant guilty. However, such is not the case before us. There is nothing in the record which clearly indicates to us that the court determined Ware's guilt before the State presented its case.

Admittedly, the best course for a judge to take in a bench trial is to refrain from expressing doubts as to a particular defense strategy and to limit his questioning of the witnesses. In the case before us, however, we find the action of the trial court judge did not deny Ware a fair trial. In other words, the trial judge's expressed skepticism at trial was directed at Ware's claim that he could engage in the repossession business with an assistant and without driving himself—an issue which was not really relevant in this case. On the relevant issue of whether Ware was driving on the night in question, the judge did not, by his comments, indicate his belief or disbelief of the defense witnesses nor did he indicate that he had made up his mind before he heard all the evidence.

We find that Ware was not denied a fair trial. His conviction is therefore affirmed.

CHEZEM, J., concurs.

CONOVER, J., dissents with opinion.

CONOVER, Judge, dissenting.

I respectfully dissent. It is clear from this record Ware was denied his constitutional right to a fair trial by an impartial arbiter, one of the fundamental rights guaranteed both by the Indiana Constitution, Art. I, Sections 12 and 13, and the United States Constitution's Fifth Amendment requiring due process of law.

On the trial date previously set by the trial court, the State told the court it wasn't ready for trial and moved for a continuance. Ware's counsel told the judge he was ready for trial and was fearful if it were continued, he might lose the benefit of certain defense witnesses who might move away. The trial commenced but the judge threatened to continue the case when Ware's counsel objected to a State's exhibit. Under the pressure of that moment, Ware's counsel offered to withdraw his objection just to keep the trial going, and leaped at the trial court's offer to hear Ware's defense without first having heard the prosecution's evidence.

The evidence of guilt was not overwhelming in this case, even after all the evidence had been heard. The police officer himself testified he did not see Ware driving the car, and all of Ware's witnesses testified someone other than Ware was driving it. Further, it must be kept in mind at the times Ware complains of judicial impropriety, there was no State's evidence before the court, only a charging information.

It is readily apparent the trial judge was prejudiced against Ware's defense from the outset. He disparaged defense witnesses with sarcastic comments as to how "fascinating" and "creative" their testimony would be even before they had testified, and told defense counsel he could present the testimony of "the Mormon Tabernacle Choir" if he wished to do so after announcing he would hear Ware's defense without having heard the prosecution's case.

In commenting on the propriety of such conduct, the court in *Dixon v. State* (1972), 154 Ind.App. 603, 290 N.E.2d 731, most appropriately said:

> Sarcasm and ridicule emanating from the bench in a criminal trial are destructive weaponry. They contaminate the trial. Their use by the trial judge may have an incalculable adverse effect on the administration of justice, ...

Whether directed at the prosecution or the defense or both, intimidated participants in the trial may be unable to perform their proper function—a cowed defense counsel fails to object to inadmissi-

ble evidence—a rattled witness becomes incoherent. *One such occurrence may thwart justice.* If such adverse effects can be demonstrated, the error created will be reversible for denial of due process of law. (Emphasis supplied).

*Dixon,* 290 N.E.2d at 740–741.[1] The most telling conduct, however, was the judge's assumption of facts not in evidence.

During the testimony of Ware's employer, the trial judge interrupted the presentation and asked the witness if he was aware the defendant didn't have a driver's license, the assumption of a fact not in evidence and one of the crucial points of the State's case. Further, the trial judge interrogated the witness as to purely inadmissible evidence, namely, whether the witness had seen Ware driving an automobile at times other than the occasion charged in the information for which he was being tried.

I believe it eminently clear the trial judge was prejudiced against Ware's defense from its outset, and for that reason Ware was denied a fair trial. While a trial judge during a court trial is given wide latitude to determine the course upon which it will proceed, his intervention cannot be such as to taint the trial with obvious unfairness, as was the case here. Even without the presence of a jury to be influenced, the trial court has the duty to conduct proceedings in an impartial manner, so as not to intimidate either party in presenting matters to the court or to demean the public image of judicial integrity. *Bruce v. State* (1978), 268 Ind. 180, 375 N.E.2d 1042, 1056; *Meyers v. State* (1977), 266 Ind. 513, 364 N.E.2d 760, 763.

Because Ware was denied a fair trial by an impartial arbiter in violation of his right to due process, I would grant Ware a new trial.

---

1. Shortly after the time of trial in *Dixon,* our supreme court enacted the Code of Judicial Conduct which deals, in part, with the manner in which judges should demean themselves during trials. Currently, Canon 3 at (A)(1) and (3) provides:

    (1) A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism....

    (3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

    I do not believe the tenets of Canon 3(A)(3) were followed in this case.