No. 86,761

STATE OF KANSAS, *Appellee*, v. MICHAEL J. MILLER, *Appellant*.

(49 P.3d 458)

Opinion filed July 12, 2002.

*John Jenab*, of Jenab & Kuchar, of Olathe, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Appellant Michael J. Miller appeals his conviction for criminal use of a financial card under K.S.A. 21-3729. Miller contends the trial judge's comments during his bench trial constituted judicial misconduct and deprived him of his constitutional right to a fair trial.

At approximately 6 p.m., while at the Oak Park Mall on the evening of August 5, 2000, Mary Gorski discovered that the credit card she had been using to make purchases at the mall was missing. Mary called the "The Walking Company," the last store she had visited, and asked if her credit card was there. The clerk that had

waited on her, Vikshit Patel, was on break at the time. The store manager told Gorski that she did not see the card. Gorski and her son then returned to The Walking Company and observed Patel return from his break with a bag from "Champs" and a bag from "Eddie Bauer." Patel denied having the card.

After leaving the mall, Gorski contacted the credit card company and learned that the last purchase on her card was at Champs in the Oak Park Mall. Gorski had not been to Champs. Immediately, Gorski went to Champs. The man she spoke with at Champs, Tyrone Johnson, initially told her that he was unable to check the credit card receipts and that she would have to come back when a manager was there. Johnson later agreed to check the receipts, and Gorski observed the receipt from her card at the bottom of the pile. Johnson told Gorski that he did not know who had conducted the sale. Gorski left Champs and called the police. A police officer accompanied Gorski back to Champs. When questioned, Johnson admitted that he was the store manager and had conducted the sale. Johnson's employee number was located on the top of the receipt, indicating that he had conducted the sale.

After further investigation, Miller, Johnson, and Patel were criminally charged. Miller was charged with criminal use of a financial card, a class A nonperson misdemeanor, pursuant to K.S.A. 21-3729. Miller waived his right to a jury trial. A bench trial was held January 19, 2001. Patel, who was on probation, pled guilty in exchange for his testimony against Johnson and Miller.

During the bench trial, Patel testified that he found Gorski's credit card while working at The Walking Company. Patel remembered that Miller, also known as "Mickey," had told Patel to come to him if he ever found a lost credit card. Miller had indicated that he would help Patel buy things with it. Miller worked at the "Watch Station" in the mall and had worked there for 2½ to 3 years. Patel went to the Watch Station with Gorski's credit card. Patel testified that he and Miller then went to Champs at Miller's suggestion. When they arrived at Champs, Miller and Johnson went off to the side to talk. Patel had not met Johnson before. When they were finished talking, Johnson asked Patel what he wanted. Johnson told Patel and Miller to bring the items to the counter. Patel purchased two

pair of shoes, a football, and a pair of gloves, totaling approximately $395, with Gorski's credit card. One pair of shoes was for Miller. Johnson rang up the sale, and Patel signed the receipt "Mary Gorski." The receipt noted the time of purchase as 6:24 p.m. Patel then took the merchandise to the Watch Station and left it there, taking an empty bag back with him to The Walking Company. Miller had told Patel to leave the merchandise at the Watch Station so that if anyone came looking for it Patel could deny everything.

Later that evening when the police came to talk to Patel, Patel confessed. Patel and a police officer then went to retrieve the merchandise from Miller. When they arrived at the Watch Station, Patel retrieved all the merchandise from Miller, except for one pair of shoes. Miller indicated the shoes were at the store next door, "Babbages." Patel and the officer then went to Babbages and retrieved the pair of shoes.

During a subsequent conversation with Miller, Patel wore a wire. Miller did not admit to using Gorski's credit card during that conversation. Instead, Miller commented on how Patel had gotten caught without any merchandise on him. Patel testified that Miller has threatened him since the incident, telling him to "[w]atch what you do or say."

Johnson pled no contest as to his involvement and was sentenced to probation. Johnson was not required to testify against Miller as a part of any agreement. Johnson testified that Miller had come into Champs that evening and that he had talked to Miller before Gorski had come to the store asking about the transaction with her credit card. When asked if Patel accompanied Miller to Champs that evening, Johnson stated that he did not know Patel and that he did not remember talking to him. Johnson knew Miller from working at the mall. After being interviewed by police, Johnson waited around for Miller and gave Miller a ride home.

Officers investigating the incident testified that Johnson had told them that he did not remember if Patel or Miller had been in Champs that evening and that he had not spoken to either of them. Johnson had also claimed he did not remember the transaction with Gorski's credit card, although he did admit that he had completed the transaction because his employee number was on the

receipt. Commissions made up a portion of Johnson's paycheck from Champs.

When questioned by police, Miller denied any knowledge of the incident. Miller told police that Patel had left the merchandise with him to hold because Patel said his mother becomes angry when he spends his paychecks at the mall. At first, Miller denied that he had gone to Champs that evening, but later told police that he had. One officer testified that Miller admitted to talking to Johnson while at Champs, while another officer testified that Miller denied having any contact with Johnson. Miller indicated that he had gone to Champs to look for a pair of shoes for his brother. Miller denied knowing Patel and indicated he only barely knew Johnson.

An employee of an affiliated store located directly across from the Watch Station told police that at some point later in the evening Miller had left the Watch Station for 2 to 3 minutes. This employee watches over the Watch Station when the Watch Station's employees have to step away.

A few days after the incident, Detective Roger Ware was in the mall. At the time, Detective Ware knew little about the incident because he had been out of town. Detective Ware had known Miller from working as a community police officer at the mall and liked him. Miller waved Detective Ware over and asked him whether he had heard any rumors about what was going on in the mall regarding credit cards. Detective Ware thought Miller was acting suspiciously. Upon telling Miller this, Miller told Detective Ware that he knew everything about the incident. When Detective Ware asked Miller whether he had been involved, Miller looked down and nodded his head up and down. Detective Ware testified that because of Miller's personality, it was possible Miller knew everything about the incident but was not involved.

A clerk from Babbages testified that Miller had brought the pair of shoes over and had indicated that he was holding them for someone else and that he would be bringing over more items. Miller never brought any additional items to Babbages. Miller had told the clerk that he needed the clerk to hold the merchandise because he (Miller) would not be around to deliver it.

A coworker of Miller's testified that she had left work about 6:40 or 6:45 p.m. that evening. She testified that from early afternoon until the time she left, Miller never left the store. She did not believe it likely that Miller could have left the store for a few minutes without her knowing, but testified that it was possible.

Miller testified that at approximately 6:50 p.m. he spoke with Patel for a few minutes at The Walking Company about a phone Patel was thinking of buying from him. Within a few minutes of returning to the Watch Station, Miller testified that Patel arrived carrying a Champs bag and an Eddie Bauer bag. Patel asked Miller to hold the items for him until later that evening because his mom became angry when he spent his whole paycheck at the mall. Miller testified that he informed Patel that he would be leaving at 9 p.m. exactly, so he would take the items next door and Patel could pick them up there. Miller testified that he then went to get something to eat. While waiting for his food, Miller indicated that he went to Champs to look for shoes for his brother, denying having talked to Johnson at that time. Miller then picked up his food and returned to his store. A food receipt was admitted into evidence showing a purchase at 7:07 p.m. Miller testified that at approximately 8 p.m. he took one pair of shoes over to Babbages. He intended to take the rest of items over later, but did not accomplish it before Patel and the officer arrived to retrieve the merchandise. Miller testified that he did not take all the items at one time because they were not in a bag and it was too difficult to carry them all. Miller testified that he had caught a ride home from Johnson after the questioning because he did not have any other ride.

Miller was found guilty and sentenced to 1 year's probation, with an underlying sentence of 8 months in the county jail. Miller was also ordered to serve 7 days in the county jail as a condition of his probation. A timely notice of appeal was filed. This court has jurisdiction by transfer on its own motion pursuant to K.S.A. 20-3018(c).

On appeal, Miller contends the trial judge's sarcasm, ridicule, repeated interruptions, and assertions of the defendant's guilt during the bench trial deprived him of his right to a fair trial. The State

disagrees and asserts that Miller was not denied his right to a fair trial under these circumstances.

The question is whether Miller's substantial rights to a fair trial were prejudiced by the alleged judicial misconduct. A defendant's right to a fair trial is guaranteed by the Fourteenth Amendment to the United States Constitution. *State v. Johnson*, 258 Kan. 61, 68, 899 P.2d 1050 (1995). Judicial misconduct is reviewable on appeal despite the lack of a contemporaneous objection when the right to a fair trial is alleged to have been violated. *State v. Chappell*, 26 Kan. App. 2d 275, 278, 987 P.2d 1114, *rev. denied* 268 Kan. 890 (1999). An appellate court's standard of review is unlimited in cases alleging judicial misconduct during trial. *State v. Plunkett*, 257 Kan. 135, Syl. ¶ 1, 891 P.2d 370 (1995). The party alleging judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. *State v. Gadelkarim*, 256 Kan. 671, 681, 887 P.2d 88 (1994).

In Kansas, the law applicable to alleged incidents of judicial misconduct is well settled. Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. Mere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial. *State v. Aikins*, 261 Kan. 346, 369, 932 P.2d 408 (1997); *Gadelkarim*, 256 Kan. at 677; *State v. Nguyen*, 251 Kan. 69, Syl. ¶¶ 4, 5, 833 P.2d 937 (1992); *State v. Beal*, 26 Kan. App. 2d 837, 845, 994 P.2d 669 (2000).

Under the Kansas Code of Judicial Conduct, a judge is to at all times act in a manner that "promotes public confidence in the integrity and impartiality of the judiciary." Canon 2 (2001 Kan. Ct. R. Annot. 489). A judge is also held to the following adjudicative responsibilities:

"(4) A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. . . .

"(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice . . . .

. . . .

"(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." Canon 3 (2001 Kan. Ct. R. Annot. 491-92).

Miller cites to numerous incidences during his trial in which the trial judge interrupted both counsel; repeatedly expressed belief that a witness was lying; hypothesized as to the reason he believed a witness was lying; made sarcastic remarks; recommended counsel proceed to another witness because the current witness was unbelievable; verbalized his inability to follow the witnesses' explanations; disregarded the testimony of a defense witness as being meaningless; and commented inappropriately in making his finding of guilt. Each comment or group of comments that Miller cites will be addressed in the order it occurred at trial.

The complained-of comments first occurred during Tyrone Johnson's testimony. During Johnson's testimony, the trial judge interrupted the questioning on 13 occasions and expressed his belief that Johnson was a liar or a worthless witness during 9 or more of those interruptions. Miller contends that the judge's hostility toward this witness undermined both counsels' examination of Johnson. On the contrary, the State asserts that these comments concerned the judge's disbelief of Johnson, a State's witness, and did not affect Miller's right to a fair trial, citing to the fact the credibility of a witness is within the province of the trier of fact.

The credibility of a witness is a matter for the finder of fact and will not be second-guessed by an appellate court. *State v. Wade*, 244 Kan. 136, 146, 766 P.2d 811 (1989). However, in this case the trial judge was not merely expressing his opinion on the witness' credibility, but was interfering with the defense's ability to cross-examine Johnson. In looking at Johnson's testimony in its entirely, it appears that the trial judge's continued interruptions and characterizations of Johnson might have resulted in defense counsel proceeding through the examination hastily and terminating it prematurely. This is especially true after Judge Bornholdt stated during cross-examination:

"He is not credible. You think I'm going to believe anything this guy—*why don't we move on to some other witness*. He is unnecessary for anything. And I'm the finder of fact, I can tell you right now." (Emphasis added.)

Miller specifically takes issue with the following statement of Judge Bornholdt that occurred during Johnson's cross-examination,

"The truth of this guy. I'm sorry Mr. Moriarty [defense counsel]. The truth is whatever is convenient for the moment. *He [Johnson] is trying to protect [Miller], not get in trouble with [Miller] and his family and friends and not be a snitch, and he is lying.*" (Emphasis added.)

Miller contends this statement evidences the fact that the trial judge had prejudged the case adversely to the defendant. The State does not address this comment specifically within its brief but appears to contend that this goes to credibility of the witness, which is an issue for the trier of fact.

This particular statement occurred after the testimony of two other witnesses and well before Miller was allowed to present evidence in his defense. The statement, unlike the others made during Johnson's testimony, states more than just an opinion that Johnson is not credible and is lying. This statement implied that the trial judge believed Miller to be guilty. In making this statement, the judge inappropriately hypothesized about Johnson's motives to lie.

Miller contends the judge then began to engage in inappropriate sarcasm and ridicule of Johnson. Some of the comments Miller cites to are:

"Q.: [Defense counsel]: Sir, the police came and saw you that night; is that correct?
"A.: [Johnson]: Yes.
"Q.: Is that an everyday experience for you?
"A.: No.
"THE COURT: It's way back in August, Mr. Moriarty, he can't remember.
"Q.: Do you remember—is this the first time you ever spoken to the police?
"A.: Yes.
"Q.: Okay. Now, that would have set off some bells for you; right?
"A.: Yes.
"Q.: And at that point in time, you should have known that you were up to your ankles in trouble.
"A.: Yes.

"THE COURT: And he is getting deeper as he testifies, I can tell you that."

These comments served no purpose other than to disrupt the proceedings and were entirely inappropriate.

Miller next cites to comments the trial judge made during Miller's testimony on direct examination. In this testimony, Miller attempted to explain why he had taken only one pair of shoes to Babbages and not all the items. During the middle of the explanation, the trial judge asked for a clarification as to what was being explained and informed defense counsel that he was not following Miller's explanation. Miller was once again asked on cross-examination why he had not taken all the items to Babbages at one time. Miller once again attempted to explain why he had not done so. After answering the question, the judge commented that Miller's explanation was still "murky."

The State contends the judge's comments did not deprive Miller of a fair trial and that the trial judge was merely attempting to develop the truth. A trial judge may quite properly propound questions to witnesses in a bench trial in order to elicit the truth. *State v. Anderson*, 243 Kan. 677, 678, 763 P.2d 597 (1988).

In a bench trial, the judge need not be concerned with giving the jury the impression that he or she is biased against the defendant. Thus, where there was no jury, the trial judge's comments to the effect that he did not understand the explanation being offered by Miller did not deny Miller his right to a fair trial. In fact, the statements of the trial judge were arguably beneficial to the defense because it alerted the defense that the judge did not understand the defendant's explanation and afforded the defense the opportunity to further explain.

Miller also takes issue with a comment made by the trial judge during Miller's testimony on re-direct. At the time of the comment, Miller was attempting to explain why he had ridden home with Johnson after being interviewed by police.

"Q.: [Defense counsel]: One question, did you have a—did you ever ride with Tyrone [Johnson] that night?
"A.: [Miller]: Yes.
"Q.: Why?

"A.: Well, because, actually, I had driven to work, my brother also works at Nordstrom's, and he needed to get off. Also, I didn't have my driver's license that night. When the police were speaking to me, they told me if I had my driver's license, I could leave. And I was, like, I don't have my driver's license. We actually even went to my car to grab the keys. Officer Fitzgerald and I walked to the Oak Park garage, and was, like, come on, come, hurry up, I don't have all day.
"Q.: The question is, why were you riding with Tyrone or Tyrone riding with you?
    "THE COURT: *He is supposed to say that they were concocting a story to—*
"Q.: The question, why were you riding together?
"A.: Because I didn't have any other ride.
"Q.: Because your brother was driving the car?
"A.: My brother brought up my driver's license that night." (Emphasis added.)

The State admits that this comment may have been inappropriate but contends that this comment alone did not deny Miller a fair trial.

Miller also takes issue with the judge's comments made after the close of the evidence. The first of those comments occurred after a short recess, when the judge stated:

"Why don't I hear some argument on this. It is all pretty fresh in my mind. I haven't had a lot of difficulty other than trying to follow a couple of explanations of what seemed like illogical events. I haven't had much time grasping the facts here."

During the State's argument, the judge commented:

"You think he kind of likes being the kingpin of the ball and the catalyst for all these clerks? . . . Kind of a fence there, you think, maybe? . . . I bet he has no criminal history. . . . And you think maybe he just couldn't refrain himself from kind of acknowledging to [Detective] Ware, well, he really knows what is going on."

And during defense counsel's closing argument, the following statement was made:

"We know that the testimony of his co-worker is pretty meaningless. She said he [Miller] never left the store, and he quite clearly agrees that he is—he was out of that store quite a lot. His testimony isn't very probative on anything."

Miller contends the judge's comment about his coworker's testimony indicates that the judge ignored or misunderstood Miller's testimony because Miller's testimony was that he left the store at 6:50 p.m., after his coworker testified she had left. The State does not address these comments.

These comments were not appropriate. However, the fact the judge misunderstood a witness' testimony is not evidence of prejudice or bias, but more appropriately a sufficiency of the evidence argument.

It is also important to note that during the prosecutor's closing argument, the trial judge interrupted the prosecutor after the prosecutor stated that Miller had testified that every one of the four testifying officers had "got [Miller's] version of events wrong." The judge informed the prosecutor, "Well, I don't think he—that it is quite fair to characterize [Miller's] testimony of saying that. I think he is basically saying that the—some of the nuances of his testimony were lost upon the police officers." This statement indicates that the judge did not view the evidence in an entirely one-sided manner as Miller contends.

Finally, Miller cites to statements made by the trial judge in rendering judgment and at sentencing. In rendering judgment, the judge stated, "I think [Miller] is pretty smooth, reminds me of Eddie Haskell on Leave it to Beaver, smooth but not very credible." In sentencing Miller to serve 7 days in the county jail, the judge referred to the jail as Miller's "temporary hotel."

Kansas courts have addressed the issue of whether judicial misconduct during a trial has denied a defendant his or her substantial rights to a fair trial on numerous occasions, with less occasion to address this issue in the context of a bench trial. Judicial misconduct during a bench trial was, however, addressed in *Anderson*, 243 Kan. 677, *State v. Starbuck*, 239 Kan. 132, 715 P.2d 1291 (1986), and *State v. Pruett*, 213 Kan. 41, 515 P.2d 1051 (1973).

In *Anderson*, the defendant was convicted of aggravated robbery following a bench trial. Anderson's primary complaint on appeal was the judge's examination of alibi witnesses, which Anderson contended elicited testimony unfavorable to the defense. The *Anderson* court reviewed the record and determined that although the answers to the judge's questions favored the State, the questions were not slanted. The court held that a trial judge may advance questions to witnesses to elicit the truth. 243 Kan. at 678. The court also noted that the judge had expressed to counsel his thoughts as to the quality of the evidence. The *Anderson* court

determined that such guidance by the judge during trial is intended to be helpful to counsel and is not a resolution of the merits of the case. 243 Kan. at 678. Finally, the court dismissed Anderson's claim that the trial judge's comments had forced him to testify as to his alibi defense, finding that the judge never requested or insinuated that the defendant must testify and there was no indication that the defendant's testimony was anything other than voluntary. 243 Kan. at 678-79.

A similar scenario was also addressed by this court in *Starbuck*. In *Starbuck*, the defendant alleged judicial misconduct during a parole revocation hearing. Throughout the hearing, the judge made comments regarding Starbuck's evidence, examined witnesses, and expressed to defense counsel his opinions and that his "patience was wearing thin." 239 Kan. at 134. The *Starbuck* court took into account the fact the matter was not tried before a jury and determined that the district judge's conduct did not result in prejudicial error.

Reversible error was, however, found in *Pruett*. In *Pruett*, the deputy county attorney moved to amend the information to charge the defendant with escape from custody, a misdemeanor, acknowledging he had been incorrectly charged with a felony. Previously, the defendant had waived his right to a jury trial under the assumption he was charged with one count of aggravated battery and one count of escape from custody, a misdemeanor. The district judge refused to allow the amendment, finding that the defendant had been correctly charged with a felony count of escape from custody. The defendant then attempted to withdraw his waiver of jury trial, but his motion was denied. The defendant was convicted of both counts at a bench trial before the same district judge.

The *Pruett* court held that the district judge abused his discretion in refusing to permit the State to amend the information as requested. 213 Kan. at 45. The court noted that a criminal proceeding is a State matter controlled by the county attorney and that the district judge does not have the right to substitute his or her judgment for that of the prosecutor, absent some compelling reason to protect the defendant's rights. 213 Kan. at 45-46. The court also held that the district judge abused his discretion in failing to

allow the defendant to withdraw his waiver of jury trial, relying upon the fact that the district judge, in refusing to allow the prosecutor to amend the information, stepped down from his role as impartial judge and assumed the role of prosecutor. 213 Kan. at 48.

Cases where a defendant has alleged that judicial misconduct in a jury trial denied the defendant his or her right to a fair trial are also instructive. In *State v. Hamilton*, 240 Kan. 539, 731 P.2d 863 (1987), judicial misconduct in a jury trial was found to have deprived the defendant of his right to a fair trial where the district judge commented on the evidence and repeatedly interrupted defense counsel during cross-examination of witnesses with comments on testimony and with admonishments to counsel. During the jury trial, when defendant's counsel lodged valid objections, the trial judge advised the State's attorney on how to restate the questions. In addition, when a State's witness was impeached by the defendant's attorney, the trial judge required the defendant's attorney to show the State's witness the witness' prior statement and then allowed the witness to change his or her answer to the question asked. The *Hamilton* court held that after reviewing the whole record, the totality of circumstances reflected that the judge's interjection of himself and his personal beliefs and observations seriously prejudiced the jury and the defendant's right to a fair trial. 240 Kan. at 547; see also *Plunkett*, 257 Kan. 135, 891 P.2d 88 (1994) (cumulative effect of several instances of judicial misconduct in jury trial prejudiced defendant's right to fair trial and included judge's comments indicating confidence in prosecutor and suspicion of defense counsel, judge's posing question to witness that was slanted to favor State, judge's interruptions of defense's opening statement, and interjections of judge's belief regarding testimony); *State v. Johnson*, 27 Kan. App. 2d 921, 11 P.3d 67, *rev. denied* 270 Kan. 901 (2000) (defendant's right to fair trial not violated even though statements of trial judge during jury trial were not necessary or warranted).

Miller cites to *People v. Phuong*, 287 Ill. App. 3d 988, 679 N.E.2d 425 (1997), in support of his contention that the judge's conduct in this case denied him his right to a fair trial. In *Phuong*,

the Illinois Court of Appeals determined that the trial judge's conduct during a bench trial denied the defendant her right to a fair trial and reversed her conviction. 287 Ill. App. 3d at 995.

During the trial in *Phuong*, the judge made numerous derogatory comments toward the defendant, her counsel, and a defense witness. The majority of the judge's remarks were a direct result of the defendant knowing little English and requiring a Chinese interpreter during her testimony. For example, the judge expressed his impatience when the defendant took the stand by stating, " 'Miss Public Defender, we're going to be here until the [F]ourth of July.' " 287 Ill. App. 3d at 994. Another example was the judge's comment, which occurred after the defendant responded to a question by shaking her head no, stating, " 'She's shaking her head in Chinese, no.' " 287 Ill. App. 3d at 994.

The *Phuong* court recognized

" '[t]he right of a defendant to an unbiased, open-minded trier of fact is rooted in the constitutional guaranty of due process of law and entitles a defendant to a fair and impartial trial before a court which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial.' [Citation omitted.]" 287 Ill. App. 3d at 993.

The court dismissed the State's argument that the judge's comments did not result in prejudice because there was no jury to be influenced, holding that because of the high standard that judges are held to, any showing of bias against one of the parties or his or her counsel constitutes reversible error. 287 Ill. App. 3d at 994-95.

Miller contends that in this case Judge Bornholdt demonstrated similar sarcasm and impatience. However, Miller also contends Judge Bornholdt's comments went even further, citing to the judge's assertions during the trial that Miller was guilty, that witnesses were lying to protect Miller, and that Miller was attempting to orchestrate the presentation of false testimony. Miller contends Judge Bornholdt's comments demonstrated bias and prejudice on the part of the factfinder, constituting reversible error.

To support his argument Miller cites a statement by the Indiana Court of Appeals:

"Sarcasm and ridicule emanating from the bench in a criminal trial are destructive weaponry. They contaminate the trial. Their use by the trial judge may have

an incalculable adverse effect on the administration of justice, which is all the more devastating because the negative is often more difficult to prove than the positive. Whether directed at the prosecution or the defense or both, intimidated participants in the trial may be unable to perform their proper function—a cowed defense counsel fails to object to inadmissible evidence—a rattled witness becomes incoherent. One such occurrence may thwart justice. If such adverse effects can be demonstrated, the error created will be reversible for denial of due process of law. *State v. Lawrence* (1954), 162 Ohio St. 412, 123 N.E.2d 271." *Dixon v. State*, 154 Ind. App. 603, 620, 290 N.E.2d 731 (1972).

We note that in *Dixon*, the defendant had alleged judicial misconduct during his jury trial. The *Dixon* court found no reversible error, finding that the defendant had failed to show he was so prejudiced as to deny him due process of law. 154 Ind. App. at 621-22.

Miller alleges he was prejudiced as a result of the trial judge's bias. Miller contends defense counsel's questioning of Johnson was effectively negated by the judge's comments, the examination of Miller was repeatedly disrupted by the judge, and defense counsel was intimidated by the judge's statements. To support his contention that defense counsel was intimidated, Miller cites to the fact defense counsel failed to object to inadmissable evidence, failed to object to the testimony of unendorsed witnesses, shortened cross-examinations of witnesses, and presented an "almost non-existent closing argument."

As to Miller's contention that defense counsel failed to object to inadmissable evidence, Miller cites to defense counsel's failure to object to a foundationless question asking Miller to speculate on the veracity of the police officers' testimony. There is nothing in the record that would support intimidation regarding this testimony. As to defense counsel's failure to object to unendorsed witnesses, we note that Patel and one of the testifying officers were not endorsed in the complaint. There is nothing in the record to show they were ever endorsed. It must also be noted, however, that Patel testified prior to any objectionable comments by the judge. Thus, Miller cannot establish that intimidation caused defense counsel to fail to object to the testimony of an unendorsed witness.

The trial judge is not merely a moderator but is the governor of the trial. The judge should strive to conduct the trial in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant. The judge should be the exemplar of dignity and impartiality, should exercise restraint over judicial conduct and utterances, should suppress personal predilections, and should control his or her temper and emotions. The judge should not permit any person in the courtroom to embroil him or her in conflict and should avoid conduct which tends to demean the proceedings or to undermine the judge's authority in the courtroom. When it becomes necessary during the trial to comment upon the conduct of witnesses, spectators, counsel, or others, or upon the testimony, the judge should do so in a firm, dignified, and restrained manner, avoiding repartee, limiting comments and rulings to what is reasonably required for the orderly progress of the trial, and refraining from unnecessary disparagement of persons or issues. *Gadelkarim*, 256 Kan. at 676; *State v. Walker*, 252 Kan. 279, 289-90, 845 P.2d 1 (1993); *State v. Hamilton*, 240 Kan. 539, Syl. ¶¶ 3, 4, 731 P.2d 863 (1987).

There is merit to Miller's contentions that defense counsel's feelings of intimidation may have kept counsel from fully examining Johnson. The trial judge's repeated comments during the third witness' testimony set the stage for the rest of the trial. However, it must be noted the judge made few remarks during the testimony of most of the witnesses, and the comments complained of only occurred during Johnson's and Miller's testimony and after the close of the evidence. Miller fails to assert what specific testimony he was unable to elicit from Johnson as a result of the judge's comments.

The State contends that Miller has not met his burden of proving prejudice. In support of this, the State cites to *State v. Ambler*, 220 Kan. 560, 563, 552 P.2d 896 (1976), where this court held that speculation as to the possibility of prejudice is insufficient to reverse a conviction.

As previously stated, a judge is to at all times act in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Canon 2 (2001 Kan. Ct. R. Annot. 489). The party

alleging judicial misconduct bears the burden of showing his or her substantial rights were prejudiced. See *Gadelkarim*, 256 Kan. at 681. In viewing the improper comments of the trial judge cumulatively and considering the prejudice that resulted from these comments, this court finds that Miller's right to a fair trial was violated. The conviction is reversed and the case is remanded for a new trial before a different judge.

Reversed and remanded.