NOT DESIGNATED FOR PUBLICATION

No. 117,594

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of E.B.G.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed December 15, 2017. Affirmed.

*Anita Settle Kemp*, of A.S. Kemp Law, Inc., of Wichita, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: Father appeals the termination of his parental rights to E.B.G. who was born in 2015. He argues he was denied a fair trial due to judicial misconduct that resulted in an unfair termination of his parental rights, which is a substantial liberty interest. Finding no error, we affirm.

On September 6, 2015, E.B.G. was placed in protective custody due to failure to thrive and the parent's inability to care for an infant. At the time she was placed in protective custody, it was believed that Father was E.B.G.'s paternal grandfather.

At a temporary custody hearing held on September 10, 2015, the district court found there was probable cause to believe the health or welfare of E.B.G. was endangered and it was in her best interest to remain in temporary custody. On September

1

14, 2015, a paternity test was ordered, and it was found that J.G. was not the grandfather but the Father of E.B.G.

An adjudication hearing was held on October 30, 2015, where Father entered a no contest response to the allegations set forth in the petition, and he waived his right to an evidentiary hearing. The district court adjudicated E.B.G. as a child in need of care and found it was in her best interest to remain in the custody of the Department for Children and Families (DCF). The court also adopted the proposed permanency plan. At the permanency hearing on February 11, 2016, the court ordered E.B.G. to remain in DCF custody.

On May 5, 2016, another permanency hearing was held. The district court ordered E.B.G. to remain in the custody of DCF. It further ordered the State to gather more information regarding Father's warrant and criminal cases. Father was to have no contact with Mother or with E.B.G and could not have any parenting time with E.B.G. until further notice. Due to a domestic violence situation, Father was to update his psychological evaluation.

The State filed a motion for a finding of unfitness and termination of parental rights on June 15, 2016. The motion alleged the parents were unfit by reason of conduct or condition which rendered them unable to properly care for E.B.G. and the conduct or condition was unlikely to change in the foreseeable future. Mother relinquished her parental rights to E.B.G. on September 26, 2016.

A termination of parental rights hearing for Father was held on October 11 and 12, 2016. Jana Walsh, a clinical specialist for the Kansas Children's Service League, testified she had done a psychological evaluation for Father by request from Saint Francis Community Services. She completed the Kaufman Brief Intelligence Test, Minnesota Multiphasic Personality Inventory, and Sentence Completion Stems.

2

From the Kaufman test she observed a lower IQ for Father. Based on this test she concluded abstract thinking and problem solving was difficult for him. From the personality test she found he had a lot of health concerns, some that had been diagnosed by doctors. However, when he was stressed he felt them in his body more. He displayed paranoid thinking—when anything happened in his life he tended to make it a catastrophe and felt people were out to get him. These characteristics translated to someone who forgot appointments and who forgot to take medications. With his intellectual abilities he would need support to raise children. With his verbal skills, she found he was the age equivalent of a 12-year-old and with nonverbal skills he tested even younger. Walsh did not make recommendations for follow ups with professionals because Father had made it clear that once he got back E.B.G., he was moving out of state to Oklahoma. Father also made it clear to her that he was distrusting of professionals in health care. Ultimately, it was her opinion that Father was not able to raise a child on his own without the help of another adult and he was not a suitable placement for E.B.G.

Macey Thompson, a family support worker for Saint Francis Community Services, testified she was the family support worker on Father's case. Visits with Father and E.B.G. began in September 2015 and were two hours twice a week. In the beginning, Mother and Father had visits together with E.B.G. but that ended when they broke up in April 2016. Father continued his two-hour visits twice a week until he was arrested and had to serve jail time. Father did not visit with E.B.G. from April 29, 2016, to June 29, 2016, because he was incarcerated. Visits began again on June 30, 2016, and were for one hour.

Thompson supervised visits with Father and was concerned because he did not know how much food to give E.B.G., when to feed her, what kind of food she needed, or how to feed her. E.B.G. is lactose intolerant and was on a nonmilk based formula, and Thompson was worried Father did not fully understand why she was on the special

3

formula. There had also been times Father brought items for E.B.G. to eat or drink that contained milk, and Thompson had to prevent Father from giving them to her. During one visit, Father tried to make a bottle that had dead roaches in it. A worker had to tell him to wash it out and how to prepare the bottle.

Thompson was concerned about Father's housing situation. The residents in the house had changed two or three times during the course of the case. There were concerns regarding some of the residents—one was volatile and others were drug addicts. There were safety issues in the home including a lack of smoke alarms, pets without tags, an open water tank in the kitchen with no safety rail or guard, and a bedroom that Thompson was not allowed to access during a walk through. Thompson testified that during an assessment on August 23, 2016, there were dog feces, a knife on the table, various items in Father's front yard, and still no smoke alarms. Thompson explained to Father what he needed to do after the assessment.

Thompson testified Father had problems giving E.B.G. too much of her acid reflux medication. She was concerned about his behavior at doctor's visits. He did not listen, take notes, or ask questions. Further, there were times during visits when E.B.G. had been afraid of Father and looked to Thompson for comfort.

Virginia York, a reintegration case manager at Saint Francis Community Services, testified she had been on the case since September 2015. During the first case plan it was recommended that Father meet with a medical doctor and take all prescribed medication, participate in parenting classes, abstain from illegal drugs and alcohol, take medication as prescribed, sign all necessary information releases, maintain stable housing, complete a budget and nutrition class, and attend all of E.B.G.'s doctors' appointments.

York requested that Father complete anger management classes as well as individual therapy. She indicated he had moved several times during the course of the

4

case and several people had lived with him. At one point, his older daughter lived with him. When the police responded to a report that Father had been assaulted, they discovered the daughter was a runaway from another state. She was taken to the juvenile intake and assessment center.

York stated that over the course of the case, she had concerns regarding Father's housing situation, his medical issues, and his emotional issues. The first and second home he lived in during the case had cockroaches, animal feces, bed bugs, and fleas. In the third home, Father was without water for 2 weeks because the water main had burst. He had an electric bill over $800 and was without utilities from December 15, 2015, to January 19, 2016. York was concerned that Father always had people coming in and out of his home.

Father had various medical issues throughout the case. He was on medications for high cholesterol, heart disease, and various others conditions. At the beginning of the case he reported a U-Haul truck had hurt his foot. He reported a city bus had injured his shoulder, and someone had thrown an ashtray at his chest which caused something to happen to his heart. He stated he collapsed at a bus station and was taken by ambulance to the hospital. Father was beaten on August 21, 2016, and received a fractured eye socket. York stated every time she met with Father he had some physical symptom or injury.

York testified she was worried about Father's anger, threats, intimidation, and yelling at E.B.G.'s resource parents. Father experienced mood swings and paranoia. York recommended individual therapy, and he did a mental intake which recommended a mental health evaluation. Father did not comply with the evaluation and was not in individual therapy. He had not completed budgeting and nutrition, mental health medication evaluation, anger management, and a transportation plan. In addition, Father had been arrested twice during the case.

York stated she believed Father's parental rights should be terminated and that terminating his rights was in E.B.G.'s best interests. E.B.G. had been in foster care since she was 13 days old, and at the time of the termination hearing she was 13 months old. Workers had attempted to work a reintegration plan with Father and help him with his court orders, but he did not comply. York stated it was important for E.B.G. to reach permanency in a timely manner so that she could attach to a family and form healthy relationships with the people she could call "mom" and "dad." York testified she did not foresee Father making enough progress to where she would recommend reintegration.

At the end of the hearing, the district court stated there was evidence that Father was around 45 years old when he was either seeing Mother romantically or had some thoughts about her. At that time, Mother was 14 or 15 years old and dating his son. The court stated this was the type of chaotic relationship E.B.G. was born into. Based on the evidence, the court stated Father might put vulnerable people at risk of harm and its duty was to make sure E.B.G.'s best interests were looked out for and protected. The court noted Father had continued legal trouble and at the first day of the hearing he was arrested for a felony warrant out of Missouri.

The district court found Father was unfit to properly care for E.B.G. and his conduct or condition was unlikely to change in the foreseeable future. The court found Father's parental rights should be terminated.

The district court found that Father's mental illness or mental deficiency and his physical disability rendered him unable to care for the ongoing physical, mental, and emotional needs of E.B.G. The court stated Saint Francis Community Services and DCF had made efforts to rehabilitate the family but Father had not taken advantage of those efforts. Father had displayed a lack of effort to adjust his circumstances, conduct, or condition to meet the needs of E.B.G., and failed to carry out a reasonable plan approved

6

by the court directed towards reintegration. E.B.G. had been in custody for over a year and she needed permanency. The court found there was clear and convincing evidence that it was in the best interests of E.B.G. to have Father's rights terminated. The court gave primary consideration to the physical, mental, and emotional health of E.B.G. in making its findings.

On appeal, Father he argues he was deprived a fair trial because the district court was biased and prejudiced against him which resulted in the unfair termination of his parental rights.

Our issue is whether Father's substantial rights to a fair trial were prejudiced by the alleged judicial misconduct. Appellate courts have unlimited review over allegations of judicial misconduct. *State v. Moyer*, 302 Kan. 892, 920, 360 P.3d 384 (2015). An appellate court must review the particular facts and circumstances of each case to determine whether judicial comments, other than jury instructions, rise to the level of judicial misconduct. If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). The "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002).

The party alleging judicial misconduct bears the burden of establishing the misconduct occurred and that the misconduct prejudiced the party's substantial rights. *State v. Hudgins*, 301 Kan. 629, 637, 346 P.3d 1062 (2015).

An allegation of judicial misconduct is reviewable on appeal despite the lack of contemporaneous objection when the defendant claims that the right to a fair trial was violated. *Kemble*, 291 Kan. at 113.

Father argues the district court "articulated an attitude that dominated each proceeding," and affected work towards reintegration. He states he did not have the opportunity to file a motion to have the judge recused during the case. Further, he states the prejudice did not become clear until the court's final ruling when the judge made it clear of his prejudice against Father due to the relationship he had with Mother. He also argues York treated him with contempt and disrespect which hindered his ability to finish court orders and prevented him from bonding with E.B.G. In conclusion, Father states he was not given a fair and unbiased opportunity to gain custody of E.B.G.

Father fails to cite to any part of the record in making his judicial misconduct allegations. He also fails to cite to any law which supports his judicial misconduct allegations. "A failure to adequately brief an issue results in abandonment or waiver." *State v. Logsdon*, 304 Kan. 3, 29, 371 P.3d 836 (2016). Further, the Kansas Supreme Court has held that "a point raised only incidentally in a brief but not argued is deemed abandoned. [Citations omitted.]" *Cooke v. Gillespie*, 285 Kan. 748, 758, 176 P.3d 144 (2008).

In addition to the abandonment of this issue, the allegations do not rise to the level of judicial misconduct. Father argues the district court was biased based on the relationship Father had with the Mother of E.B.G. While the court did note E.B.G. was born into a chaotic relationship based on the ages of Father and Mother and that Mother had dated Father's son, the court terminated Father's parental rights based under K.S.A. 2016 Supp. 38-2269(b)(2), (7), and (8) as well as K.S.A. 2016 Supp. 38-2269(c)(3), all of which were supported by clear and convincing evidence. In addition, the court did not make its decision based on Father and Mother's relationship, it simply noted the child was born into a chaotic setting. Just the mere possibility the judge may have been prejudiced by Father and Mother's relationship is not sufficient to overturn the judgment. See *Miller*, 274 Kan. at 118. Father has not demonstrated that judicial misconduct occurred.

8

The district court did not engage in judicial misconduct and, therefore, did not prejudice Father's substantial rights. The district court is affirmed.

Affirmed.