NOT DESIGNATED FOR PUBLICATION

No. 117,229

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LARRY DEAN MERCER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed May 18, 2018. Reversed and remanded.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Patrick Henderson*, assistant county attorney, *Gerald R. Kuckelman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., GREEN, J., and STUTZMAN, S.J.

PER CURIAM: At the conclusion of a two-day trial a jury convicted Larry Dean Mercer of the off-grid crime of aggravated indecent liberties with a child, K.K. The district court denied Mercer's motion for departure to the sentencing grid and sentenced Mercer to life in prison. Mercer appeals his conviction and sentence, claiming: (1) insufficient evidence based on a failure to prove K.K. was under the age of 14 at the time of the crime; (2) judicial misconduct in requiring him to call a friend of the victim as a witness; (3) prosecutorial error in argument; and (4) error in denying his departure

1

motion without clearly following the statutory procedure. Because of prejudicial prosecutorial error, we reverse the conviction and remand for a new trial.

FACTS AND PROCEDURAL BACKGROUND

K.K. was 14 years old at the time of trial. Mercer was married to K.K.'s grandmother and K.K. had known him all her life. For a period of time, K.K. lived close to her grandparents and would stay at the Mercers' house after school and in the summer. During the summer before K.K.'s seventh grade year, she asked if she could live with her grandparents for a couple of months and did so.

On January 30, 2016, K.K. told her mother Mercer had been sexually abusing her. K.K. testified a friend had been sexually assaulted by her boyfriend and told her mother about it, and her friend's mother believed her. K.K. said this prompted her to tell her mother about her own abuse because "I thought my mom would believe me." K.K. said she was embarrassed and did not tell anyone about what happened, and Mercer told her not to tell anyone because she would go to prison if she did. She said she believed what Mercer told her and thought she would get into trouble for what had happened. K.K.'s mother reported the abuse to the police. After conducting an investigation, the State charged Mercer with one count of rape, one count of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child.

K.K. testified that when she was 9 or 10 years old, Mercer began touching her inappropriately. K.K. recalled the first time something inappropriate happened, she was in the garage playing a hand-held video game. There was a part of the game where "sexual stuff happened," and Mercer asked K.K. if she knew what that was, then started rubbing her thigh. A couple of days later, also in the garage, Mercer again rubbed K.K.'s thighs, moving higher up her legs than before, and on a later occasion he rubbed her

2

thighs and touched her vagina. K.K. said this happened at least 10 times in the garage or the house.

K.K. also described a time when she was 9 or 10 years old when Mercer raped her in his bedroom—removing her clothing and putting his penis in her vagina. She said this happened after Mercer told her to go into his bedroom when they were alone in the house together. K.K. said Mercer used a condom because she saw it afterwards in his hand as he ran to the bathroom. A couple of months later, Mercer took K.K. alone to the state lake to ride on a four-wheeler. K.K. testified she was driving the four-wheeler on back roads when Mercer told her to pull over so he could get a beer. She said Mercer then pulled her behind a bush, removed her pants and underwear, and had her lie on a blanket. K.K. testified he then laid on top of her and put his penis into her vagina. Although she did not recall when it occurred, K.K. told the jury there was one subsequent incident when Mercer again told her to go into his bedroom and he once again engaged in sexual intercourse with her.

In further incidents, K.K. also testified about: digital penetration by Mercer while in his truck; a time when she and Mercer sat in adjacent recliners in his house and he reached over, took her hand, placed it inside his pants on his penis, and made her rub it; and at least two times in the garage when Mercer made K.K. take his penis into her mouth.

The last occurrence about which K.K. testified was during the family gathering on Christmas day in 2015. While the family was at the Mercers' house, K.K. said Mercer grabbed her by the wrist, pulled her down onto his lap, and "rubbed his penis around [her] butt." Both were clothed, and they were alone in the living room.

3

Mercer's wife, Connie, testified on his behalf that she and Mercer had not had sex for perhaps 10 years because he was unable to get an erection. Connie testified that Mercer tried taking Viagra, but it did not work.

Robbie K., K.K.'s uncle, often stayed with K.K.'s family over weekends between trips as a truck driver. He testified that as he came upstairs one night he overheard K.K.'s friend A.G. ask her "what story are you going to come up with next time in court[?]" Robbie K. said he did not hear K.K. say anything in response and heard nothing else of the conversation between the two girls. Mercer called A.G. as a witness, and she denied making the statement Robbie K. attributed to her. In cross-examination by the State, A.G. said K.K. never gave her any reason to believe that she was being dishonest.

Dr. Jon Siebert, Mercer's physician, testified Mercer reported a problem with erectile dysfunction in November 2008 and again a year or two later. He prescribed Viagra in 2008 and thought it more than likely he allowed some refills of the prescription but commented that refills typically are authorized for a year, then expire at the pharmacy. Dr. Siebert said his records did not have information about whether the Viagra worked for Mercer.

The jury convicted Mercer of aggravated indecent liberties with a child and acquitted him of the other two charges. The district court denied Mercer's motions for a new trial and judgment of acquittal. Mercer filed a "Motion for Dispositional Departure or in the Alternative Durational Departure." As reasons for granting his motion, Mercer cited: (1) no criminal history, (2) he was 69 years of age; (3) he did not present a danger to the community; (4) he had the support of family (other than K.K.'s family); and (5) there were programs in the community to assist him. The district court denied Mercer's motion for a downward departure and sentenced him to life imprisonment without parole for 25 years.

Mercer timely appeals his conviction and sentence.

ANALYSIS

Mercer presents four issues for our review: (1) the evidence was insufficient to support the conviction; (2) the district court erred by stating if Mercer did not call A.G. to testify, it would instruct the jury to disregard Robbie K.'s testimony about the statement he said he overheard A.G. make to K.K.; (3) prosecutorial error in argument; and (4) failure by the district court to comply with the requirements detailed in *State v. Jolly*, 301 Kan. 313, 342 P.3d 935 (2015).

*Sufficiency of the evidence*

*Standard of review*

Our standard of review is well-established when the evidence is challenged for insufficiency:

> "When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. McClelland*, 301 Kan. 815, 820, 347 P.3d 211 (2015).

We do not reweigh the evidence or assess the credibility of witnesses. *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

A verdict may be supported by circumstantial evidence if that evidence provides a basis from which the fact-finder may reasonably infer the existence of the fact in issue. The evidence need not exclude every other reasonable conclusion or inference. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). There is no distinction between direct and

circumstantial evidence in terms of probative value. *State v. McBroom*, 299 Kan. 731, Syl. ¶ 6, 325 P.3d 1174 (2014). However, the circumstances used to infer guilt must be proved and cannot be inferred or presumed from other circumstances. *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009).

*Discussion*

The jury convicted Mercer of the charge in Count II of the complaint, which alleged conduct occurring between June of 2010 and December of 2015. Mercer claims there was insufficient evidence to support that conviction because the State failed to present evidence that K.K. was under 14 years of age at the time of the alleged crime. Evidence that K.K. was under 14 was a required element for Mercer's off-grid conviction of aggravated indecent liberties with a child in violation of K.S.A. 2017 Supp. 21-5506(b)(3)(A). The State acknowledges K.K. was not asked her date of birth and does not point to any other source in the evidence providing her specific birthdate.

Jury Instruction No. 8, listing the elements of Mercer's crime of conviction, stated:

"The defendant is charged with aggravated indecent liberties with a child. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant engaged in lewd fondling or touch of K.K.

"2. The defendant intended to arouse or satisfy his sexual desires.

"3. At the time of the act, K.K., was less than 14 years old. The State need not prove the defendant knew the child's age.

"4. The defendant was 18 or more years old at the time the act occurred.

"5. This act occurred between June of 2010 and December of 2015, in Atchison County, Kansas."

That instruction also provided the definition of lewd fondling or touching.

K.K. testified the first incident with Mercer occurred when she was 9 or 10 years old. K.K. also testified both to additional touching and three occurrences of rape by Mercer, all before she was 14. Rose Webb, social work specialist for the Department for Children and Families, testified she conducted a forensic interview of K.K. on February 3, 2016, when K.K. was 14. K.K. described Mercer's actions to her, which K.K. said occurred from the time she was about 8 years old until she was about 13. K.K. told Webb the incidents of oral sex were when she was between ages 9 and 13, but closer to the earlier part of that range.

In *State v. Perez-Rivera*, 41 Kan. App. 2d 579, 203 P.3d 735 (2009), a panel of this court held that a conviction cannot be sustained when the victim's age is an essential element of the crime and the State fails to provide proof of that element. In *Perez-Rivera*, the State failed to prove the victim was over 18 years of age to meet the definition of a family or household member for the crime of domestic battery. The State argued circumstantial evidence supported the conclusion that the victim was older than 18 because the jury could observe her appearance and demeanor. The State also pointed out both the victim and defendant testified they had been married for two and one-half years and defendant said they were married in Las Vegas, from which the State suggested the jury could infer the victim was over 18 because the minimum marriage age in Nevada was 16. Our court found this was insufficient to establish the victim's age; the marriage age in Nevada was not in evidence, so the jury would be required to infer the victim was 18 based on their personal observations and knowledge. Thus, the court reversed the defendant's conviction. 41 Kan. App. 2d at 583.

In this case, the members of the jury did not need to find evidence for the element of K.K.'s age based on either their observations of her or their personal knowledge. In its brief, the State appears to concede that K.K. was 14 years of age on December 25, 2015, the date that K.K. testified Mercer pulled her onto his lap and rubbed his penis on her buttocks. But K.K., who testified she was 14 at the time of trial in November 2016, said

7

that prior to the incident on Christmas day 2015, it may have been more than a year since Mercer had sexual contact with her. The State presented evidence through K.K. and Webb from which the jury could determine K.K. was under the age of 14 years at the time of almost all the alleged incidents supporting a conviction of aggravated indecent liberties with a child.

Mercer then contends that since one of the acts in evidence—Christmas 2015—was after K.K. turned 14, his right to a unanimous verdict was violated. When the State alleges multiple acts which could each constitute a separate crime, the State must either inform the jury which act they are relying on or the court must instruct the jury to agree on a specific act. *State v. De La Torre*, 300 Kan. 591, Syl. ¶ 2, 331 P.3d 815 (2014). The district court instructed the jury that the State had claimed multiple acts "which each could separately constitute the crime of aggravated indecent liberties with a child" and it "must unanimously agree upon the same underlying act."

The jury instructions clearly required the jury to agree unanimously on a particular act to convict Mercer and that all of the elements of the crime must be met. In the absence of any indication otherwise, this court can assume that the jury understood and followed the instructions of the court. "'We generally presume jurors follow the instructions given them in the district court.'" *State v. Mattox*, 305 Kan. 1015, 1027, 390 P.3d 514 (2017) (quoting *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 [2011]).

When the evidence is viewed in the light most favorable to the State, it is sufficient to support the jury's conclusion that Mercer was guilty beyond a reasonable doubt of aggravated indecent liberties with a child.

*Judicial misconduct*

Mercer next asserts the district court erred when it threatened to strike a defense witness' testimony if the declarant of a hearsay statement was not called as a witness. Mercer claims the district court's action was an abuse of discretion and rose to the level of judicial misconduct. The State responds that even if the threat constituted error, the error was harmless and did not affect the outcome of the trial.

*Standard of review*

Appellate courts have unlimited review over allegations of judicial misconduct during trial. *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). When there is an allegation of judicial misconduct, the particular facts and circumstances determine whether the comments of a judge constitute judicial misconduct. The party claiming judicial misconduct has the burden to show both that it occurred and that the misconduct prejudiced the party's substantial rights. If a proper and reasonable interpretation will render the judge's remark unobjectionable, the remark cannot be found to be prejudicial. *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010). The "[m]ere possibility of prejudice from a judge's remark is not sufficient to overturn a verdict or judgment." *Miller*, 274 Kan. at 118.

*Discussion*

At trial, Robbie K. testified he overheard K.K.'s friend, A.G., ask K.K.: "what story are you going to come up with next time in court[?]" He said he heard no response from K.K. Once Robbie K. was excused, the district court called the attorneys to the bench and asked defense counsel if he planned to call A.G. as a witness. Defense counsel said he did not plan on calling her, and the court declared if defense counsel did not call A.G. to testify, it would instruct the jury to disregard Robbie K.'s testimony regarding her

9

statement. Defense counsel voiced his disagreement with the court's assertion that he had to call A.G. as a witness, since she was present in the courthouse. The State had asserted no objection during Robbie K.'s testimony about A.G. and had cross-examined him about what he heard. But the prosecutor offered a bare mention of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), and suggested a break so he could step out to talk with A.G. Defense counsel said he would go with the prosecutor.

After a brief recess, the following exchange occurred

"THE COURT: Back on the record in State vs. Larry Dean Mercer.

"An issue arose prior to our taking a break concerning a statement which the last witness testified to as coming from a third-party witness.

"Are we in agreement as to that?

"MR. KURTH: Yes, Judge.

"THE COURT: *State vs. Kelley*, 42 Kan. App. 2d 782, the Supreme Court—or the Court of Appeals actually—indicated that in a criminal proceeding, the first step in analyzing whether a statement is admissible hearsay is to determine whether the statement was testimonial.

"It goes on to say that the declarant's mere presence at the hearing is insufficient for the hearsay statement to be admissible in a criminal proceeding, while it is better practice to call the declarant as witness before a hearsay statement is offered into evidence, the failure to do so does not violate the confrontation clause as long as the declarant actually testifies.

"It's my understanding you do intend to call the declarant, is that correct?

"MR. KURTH: Judge, yes.

"Mr. Kuckelman and I have spoken with her.

"I am going to call her.

"THE COURT: I would point out to both parties that the distinction in this, it is a statement against a defendant in a criminal case, rather than a statement against an alleged victim in a criminal case.

"So there is that distinction.

"But this is a case that I was referring to when I made the statement to the parties.

10

"If you are ready, we'll call the jury back in."

Defense counsel then called A.G. as a witness.

Mercer alleges judicial misconduct, asserting the district court crossed "the line between being the impartial governor of the trial and being an advocate for the prosecution." *Kemble*, 291 Kan. at 120. The district court has considerable discretion in conducting trials and hearings. Judges should exercise care not to become an advocate and give the jury the impression that they are biased against a party. *State v. Hamilton*, 240 Kan. 539, 547, 731 P.2d 863 (1987).

Specifically, Mercer complains the district court: (1) erred in functionally asserting an objection the State did not; (2) erred on the law; and (3) abandoned its proper neutral role in the trial. The State contends that although defense counsel originally did not intend to call A.G. as a witness, he agreed to do so and did not state that she was being called solely at the direction of the court. When asked following the break if the defense intended to call A.G. as a witness, defense counsel said without any objection or reservation that she would be called to the stand.

Mercer's first and third claims are essentially the same and are related to the question of prejudice. In his other contention, Mercer asserts the district court was "wrong on the law" and argues the merits of whether A.G. needed to testify under the Confrontation Clause of the United States Constitution. But Mercer failed to preserve this evidentiary question for review when A.G. was called as a witness without qualification or objection. K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Dupree*, 304 Kan. 43, 62, 371 P.3d 862 (2016). We need not discuss the merits of this evidentiary ruling.

11

Although based on a well-intentioned understanding of the law, the intervention by the district court into Mercer's choice of witnesses in his defense is a concern. Mercer's point is well-taken that the district court inserted itself into the issue in the absence of any objection by the State—even more, it followed the State's acquiescence by engaging in cross-examination of A.G. about the statement Robbie K. attributed to her. The potential reasons Mercer did not intend to call K.K.'s best friend to testify are not difficult to imagine. Having gained from Robbie K. the evidence he wanted, without objection from the State, Mercer could leave it to the State to call A.G. if it thought it necessary. That would have placed Mercer in the position to cross-examine A.G. rather than present her to the jury as his own witness, which resulted in testimony contrary to that which he had just elicited from his previous witness, Robbie K. While Mercer ultimately called A.G. to testify without noting an objection, the record is clear he would not have done so if the district court had not interceded.

With respect to Mercer's assertion of judicial misconduct, we find no showing of prejudice requiring reversal. Even if the district court stepped out of its role as neutral governor of the trial, Mercer gave us no contemporaneous record of his reasons for electing to call A.G., and he makes no persuasive argument now that, in the context of all the evidence, any prejudice resulted.

*Prosecutorial error*

For his third issue, Mercer asserts the prosecutor committed reversible error during closing arguments by vouching for K.K.'s credibility. The State contends the prosecutor never vouched for the credibility of K.K. during closing argument but based his statements on the evidence and asked the jury to consider what motive K.K. had to falsely accuse Mercer.

12

*Standard of review*

A claim of prosecutorial error based on comments made during opening or closing argument will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012). In *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016), the Kansas Supreme Court revisited the process of judicial review of prosecutorial behavior. The court established a new, two-part test for reviewing claims of "prosecutorial error," including "any and all claims asserted by a criminal defendant that his or her Fourteenth Amendment due process rights to a fair trial have been violated by any act or statement of the prosecutor." *Sherman*, 305 Kan. at 108.

Under the modified *Sherman* standard, the appellate court uses a two-step process to evaluate claims of prosecutorial error:

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need

13

only address the higher standard of constitutional error.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

*Discussion*

Mercer argues the State committed prosecutorial error by attempting to bolster K.K.'s credibility. At the outset of his argument, the prosecutor told the jury the case was about credibility; "simply" about whether they believed K.K.'s testimony. The prosecutor asked the jury to think about how difficult it must have been for 14-year-old K.K. to testify about sexual contact with her grandfather. The prosecutor said:

"[K.K.] got up here and told it to the 12 of you, with all the rest of us in the courtroom, with an audience.

"Possibly even the press was back there.

"Possibly it could end up in the paper.

"But yet she got up and did it.

"[K.K.] got up and told you about it.

"You have to ask yourself, if somebody's making up a story, are they going to go to that extreme.

"You were able to see yesterday the split in this family.

"[K.K.] has family members that are angry with her over this.

"Is she going to do that if she's making this up?

"You know, [K.K.] sat there.

"We didn't see any tears.

"She wasn't emotional about it.

"You have to wonder, why was that, why was [K.K.] able to sit there and calmly tell us about this.

"Well, think back what the last 10 months of her life have been like.

"You know, she lived with this secret of what her grandfather did to her for four years before she told anybody.

"That had to torment her.

14

"Finally she told her mother about it, told her mother about having sex with her grandfather."

The prosecutor continued:

"Is somebody going to do that that's making it up?

"Are you going to keep telling all these different officials?

"Are you going to keep getting put through this if you're making it up?

"She has lived through torment from this.

"It's because she brought it out.

"Maybe she wishes she hadn't.

"She sat there and people say, are you telling us the truth.

"What must be going through her mind, are you kidding me, am I telling the truth, does anybody want to have to get up here and do this?

"Well, [K.K.] did it.

"She did it because she had to.

"*She did it because she had to get rid of this burden she was carrying around, the embarrassment, the indignity of doing all that.*

"*She did it over and over.*

"*Who is going to suffer through that if it's not true?*

"*What is there to indicate that it's not true?*

"If [K.K.] made this up, you got to wonder why, why would she make this up?

"You know, the testimony was that grandma and grandpa were good to her, took her out for dinner, bought her clothes, took her to the [Renaissance] Festival.

"I think there's a photo of her riding an elephant with grandpa.

"*Why would you make this up about somebody that has been good to you if it's not true?*

"*Why would you make that up?*

"*There has been no motive here.*

"*We've heard nothing that would tell us why [K.K.] would make up this horrible story about her grandfather.*

"We've had a little bit of talk about that she had been grounded.

"But her mother said that was for two days and that had been a month before any of this even went on.

"No.

"*No, [K.K.] didn't make this up*.

"She sat there in graphic detail—graphic detail—and told you how Larry Mercer raped her, sodomized her, how he rubbed her, how he did all these horrible things to her that no child should have to endure, especially from a loved one like their grandfather.

"It took a lot of courage for her to get up and tell this story.

"But she did it.

"She told you the story.

"*It's a believable story*." (Emphases added.)

In conclusion, the prosecutor emphasized that the overall facts in K.K.'s story were the same:

"[S]he never told stories that conflicted.

"Her story has been consistent throughout the course of this case, throughout the investigation, and throughout her testimony in the courtroom.

"Her story has been consistent because it's the story she believes.

"[K.K.] has told you what happened with her.

"*Her story is credible*.

"I'm asking you to find Larry Mercer guilty on all three counts." (Emphasis added.)

In the rebuttal part of the State's argument the prosecutor began:

"You just heard the defense.

"What's missing?

"Motive?

"Where's the motive?

"Why would [K.K.] make this up?

"*We don't hear a word of that from the defense because there is no motive*.

"*There is no reason for [K.K.] to make this up*." (Emphasis added.)

16

A prosecutor is not permitted to offer his or her personal opinion on the credibility of witnesses. *State v. Hart*, 297 Kan. 494, 505, 301 P. 3d 1279 (2013). See Kansas Rules of Professional Conduct 3.4(e) (2018 Kan. S. Ct. R. 347) (a lawyer shall not state a personal opinion as to the credibility of a witness). A prosecutor also may not express his or her personal belief regarding the defendant's guilt. *State v. Hall*, 292 Kan. 841, 853, 257 P.3d 272 (2011). Such comments are "unsworn, unchecked testimony, not commentary on the evidence." *State v. Bridges*, 297 Kan. 989, Syl. ¶ 17, 306 P.3d 244 (2013). A prosecutor may comment on inconsistencies in a defendant's statements or may point out weaknesses in a story. 297 Kan. at 1013. "Particularly when a case turns on which of two conflicting stories is true, parties may advocate for reasonable inferences based on evidence suggesting that certain testimony is not believable." *Hart*, 297 Kan. at 505. The prosecutor may also explain to the jury what it should look for in assessing witness credibility. See *State v. Huerta-Alvarez*, 291 Kan. 247, 262, 243 P.3d 326 (2010). But the jury must be left to draw the ultimate conclusion on witness credibility. *Hart*, 297 Kan. at 505-06.

Our Supreme Court has considered a prosecutor's assertion about the absence of motive for witnesses to testify untruthfully. In *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d 828 (2015), one of the two improper statements the court found the prosecutor made was in the rebuttal portion of argument and referred to two witnesses: "I submit they don't have any motive in coming in here and testifying." The Supreme Court noted its consistent holding that a prosecutor may not make arguments trying to bolster the credibility of the State's witnesses. The court also observed, however, that under different circumstances it had found prosecution comments about a witness' lack of motive for untruthfulness to be both proper and improper. See *State v. Donaldson,* 279 Kan. 694, 708, 112 P.3d 99 (2005) (State improperly bolstered testimony of a detective by stating he received no additional pay for testifying as he did and if he was making testimony up he could ruin his career and other trials); *State v. McReynolds,* 288 Kan. 318, 325-26, 202 P.3d 658 (2009) (statement in argument that "[n]o police officer benefits from this

17

investigation, no police officers benefit from concocting stories and making [defendant] agree to those stories" was within latitude allowed to prosecutors, especially in response to defendant's argument police used coercive tactics).

In *State v. Akins*, 298 Kan. 592, 608, 315 P.3d 868 (2014), our Supreme Court found that the prosecutor had improperly vouched for the credibility of the witnesses by stating her personal opinion: "'Yes, they are credible,'" and "'Yes, that's credible,'" in talking about the complaining witnesses. The court also found misconduct in that case when the prosecutor expressed her personal opinion about the defendant's credibility: "'His statements I never touched those kids in a sexual way are not credible.'" 298 Kan. at 607-08.

In this case, the prosecutor's argument evidenced an attempt to bolster K.K.'s credibility—an impermissible practice. A prosecutor may argue that one person's story is more credible than another based on "'reasonable inferences'" from the evidence. *State v. King*, 288 Kan. 333, 352, 204 P.3d 585 (2009). But the prosecutor here went beyond this permissible comment and consistently vouched for K.K.'s credibility, both indirectly—through assertions about K.K.'s lack of motive to be untruthful—and directly, by declaring to the jury "No, [K.K.] didn't make this up," "It's a believable story," and simply, "Her story is credible."

In *King* the defendant complained that the prosecutor had engaged in improper argument by saying "Who has the motive to be untruthful? It's not [L.E.]" and "The person who has the motive to be untruthful is not [L.E.]." 288 Kan. at 350. The court said:

> "It was not improper for the prosecutor to argue that L.E. did not have a motive to be untruthful—this statement does not constitute vouching for the witness' credibility. *This conclusion is strengthened by the fact that defense counsel also made comments during*

18

*closing argument as to whether L.E. or King had a greater motivation to fabricate a story."* (Emphasis added.) 288 Kan. at 353.

Here, however, the prosecutor was not responding in rebuttal to argument by Mercer's attorney, comparing the situations of the two. Instead, the prosecutor began the "no motive to be untruthful" comments early in the opening portion of argument and reasserted them multiple times in several formulations, usually asking the jury to speculate about "why would you do that?" or "who would put themselves through that?" if she was making this up. Repeated early and often, this theme took the shape of an attempt to bolster K.K.'s credibility rather than to urge reasonable inferences drawn from the evidence. The lack of motive theme was then capped with the prosecutor vouching outright for K.K.'s credibility. This was error, falling outside the "wide latitude" prosecutors have to argue for convictions.

The second step of the *Sherman* process looks to the record to decide whether the error found in the first step prejudiced the defendant's right to a fair trial. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011], *cert. denied* 565 U.S. 1221 [2012]).

Mercer contends the prosecutor's multiple instances of telling the jury no motive had been shown for K.K. to testify untruthfully—e.g. "We've heard nothing that would tell us why [K.K.] would make up this horrible story"; "What's missing? Motive? Where's the motive? Why would [K.K.] make this up? We don't hear a word of that from the defense because there is no motive."—had a burden-shifting effect, inferring Mercer had failed to present evidence of a reason for K.K. to testify untruthfully.

This was a case in which the State had announced the outcome would depend on the jury's assessment of the credibility of the parties rather than any physical evidence or eyewitnesses. In that setting, Mercer reasons it was then prejudicial for the prosecutor to argue repeatedly no motive had been shown for K.K. to tell anything but the truth and to vouch directly for K.K.'s credibility. He also claims the State did not have "overwhelming evidence," as shown by his acquittal on two of the three charges against him.

The State maintains it did no more than respond to Mercer's questioning of K.K.'s credibility in opening statement, asking "why would she say that about her step-grandfather[?]" and its overall theme that K.K. was not being truthful. Based on that, the State claims it was "proper for the prosecution to make the argument that the victim was credible based upon the facts and lack of a motive to be untruthful." The State asserts the district court instructed the jury on the burden of proof, and it did not try to shift that burden to Mercer but tried to "guide the jury through the evidence."

As we have observed, in its closing the State repeatedly raised the absence of motive for K.K. to be untruthful, in an apparent effort to bolster K.K.'s credibility. Then the prosecutor simply vouched three times for K.K.'s version of events. With little in the way of corroborating evidence, the case turned on an assessment of credibility. The State has not shown beyond a reasonable doubt that prosecutorial error did not affect the outcome of the trial, or that there was no reasonable possibility the error contributed to the verdict.

With both prosecutorial error and prejudice as defined in *Sherman*, the error requires reversal. In light of that finding, we need not consider Mercer's remaining issue concerning his motion for departure.

Reversed and remanded for a new trial.

20